LITTON INTERNATIONAL DEVELOP-MENT CORPORATION, Petitioner and Plaintiff,

v.

CITY OF SIMI VALLEY, the City Council of the City of Simi Valley, Robert O. Huber, Ann Rock, Clyde Evans, Vicky Howard and Greg Stratton, Respondents and Defendants.

No. CV 82–6648–ER(Tx).

United States District Court, C.D. California.

July 5, 1985.

Paul R. Salerno of Cutler & Cutler, Los Angeles, Cal., for petitioner and plaintiff.

Bert Deixler of McCambridge & Deixler, Los Angeles, Cal., for respondents and defendants.

## MEMORANDUM OPINION

RAFEEDIE, District Judge.

## I. INTRODUCTION

This case came on for trial July 20, 1984 through July 25, 1984. Plaintiff Litton International Development was represented by Paul R. Salerno of Cutler & Cutler and defendant City of Simi Valley was represented by Bert Deixler of McCambridge & Deixler.

Plaintiff Litton International Development purchased a parcel of land in the City of Simi Valley in 1980 and, in 1981, was denied a permit to develop the property. According to the City the denial was because the proposed development was inconsistent with the City's General Plan. In 1982 the City amended its General Plan so that the parcel could only be used for residential development. Plaintiff challenges the City's 1981 and 1982 actions alleging the actions are unconstitutional or, alternatively, in violation of state law.

## II. FACTS

In December 1980 plaintiff Litton International Development Corporation ("Litton") purchased a parcel of undeveloped land ("Litton parcel" or "parcel") of approximately four-and-one-half acres located at the southeastern corner of Erringer Road and Alamo Street in the City of Simi Valley ("the City") for $1,875,000. At the time of the purchase the Litton parcel's land use designation in the City's General Plan was General Commercial with a Hotel/Motel Node.[1]

The first land use designation for the parcel, Convenience Commercial, had been adopted as part of the first General Plan for the City of Simi Valley in 1972. In 1980, the parcel's designation was changed to General Commercial with a Hotel/Motel Node.[2] On August 9, 1982 the final change in the land use designation occurred. By a vote of the City Council the General Plan was amended and the classification of the Litton parcel was changed to Intermediate Density Residential. It is this final change in the land use designation, and the events leading up to it, that are at issue in this litigation.

Litton first expressed interest in land in the City during mid-1980 when a Litton representative, Fulton Britt, approached the Director of the Department of Community Development for the City, Wayne

---

1. The "Hotel/Motel Node" description was used by the City to identify the vacant parcels of commercial land in the City that were close to the freeway and contained approximately five acres of land and, therefore, were suitable for the construction of a hotel and convention center. Wayne Goldberg, Director of the City's Department of Community Development, explained: "There are a number of [Hotel/Motel] Nodes on various properties in the community. Those indicate sites that are particularly desirable, usually because of their freeway access, to serve as motel sites. In terms of implementation, what the General Plan says is that these can be used as motel sites and in fact they can be used for non-motel types of purposes as well. But [the General Plan] specifies that ... before you use up all those Motel Nodes it has to essentially come back to the Council because you're eliminating all the primes sites in the City and that was a thing the General Plan wanted to discourage." (Ex. 175; Goldberg testi-

mony at November 2, 1981 City Council meeting). The effect of a Hotel/Motel Node designation on a piece of property under the General Plan was that if there were only one such node left in town, it would have to be developed as a hotel.

2. The 1980 General Plan update abandoned the use of the "Convenience Commercial" designation and lumped all commercial property into one classification.

Wayne Goldberg, Director of the City's Department of Community Development stated in a declaration to the court, submitted in support of the City's Motion for Summary Judgment, that from 1977 to 1980 the parcel's designation was Residential. In reviewing the record, it does not appear to the court that Goldberg's statement is accurate. The parcel's land use designation from 1972 through 1980 was Convenience Commercial.

Goldberg, and told Goldberg that Litton was looking for land to use for the construction of condominiums for temporary use by foreign students who would be trained at a nearby Litton facility. These condominiums would ultimately be sold for normal use as housing. Subsequently Litton modified its thinking and decided to construct a hotel that would first be used to house the foreign students and then be operated as a normal commercial hotel. Litton representatives and City planning officials met a number of times to discuss the proposed hotel development and, because of Litton's interest in facilitating a speedy approval of its plans and permits, Litton filed a "preapplication." (No. 80-9-22-57; Joint Exhibit No. 259 (hereinafter "Ex. ____")).

The preapplication process was designed by the City to expedite and encourage commercial development. Preapplication plans were not detailed and were submitted to the City for general comment so that developers could make modifications in their final development plans before formal approval was sought. The comments given during the preapplication process were advisory in nature.

Litton's entire first preapplication process was completed during the Fall of 1980 before December 1980 when Litton purchased the parcel. While the City's reaction was generally favorable at this early stage of the process, Litton was or should have been aware that there were potential problems with the proposal. As Litton stated in its proposed Findings of Fact:

> At that time (the fall of 1980) the thought did occur to Wayne Goldberg that a problem might arise from Litton's plans to build a hotel in two phases, the first phase (for the Interim Use [to house the foreign students]) being less than the 100-unit hotel the City wanted. The problem related to the Planning Commission's concern that any hotel on the Litton Parcel having a size under 100 units may not be approved on the ground it would undermine the market for a larger hotel having over 100 units and restau-

rant and banquet facilities. Wayne Goldberg and Barbara Schoetz of the Department of Community Development discussed this problem while they were reviewing the Litton preapplication; specifically Barbara Schoetz asked Wayne Goldberg whether she should mention this potential problem to Litton when the City responded to the preapplication, to which Wayne Goldberg responded, "Mention but don't over kill" (Trial Testimony of Wayne Goldberg and Exhibit 297–9).

*Plaintiff's Amended Findings of Fact and Conclusions of Law,* ¶ 18. Litton contends that these potential problems with the development were not made known to it during the preapplication process. This contention is partially refuted by the letter written by the City to Litton formally responding to the preapplication. In that letter Barbara Schoetz of the City's Department of Community Development informed Litton of a number of potential problems with the proposal. She discussed the potential for opposition from the Neighborhood Council because of the residential character of the parcels surrounding the proposed hotel and the potential for Planning Commission opposition because of the plan to construct the hotel in two phases. Though not using the most comprehensible sentence structure, Schoetz flagged these two potential problems. She wrote:

> The use of the areas to the single family housing to the east and southeast will be of great interest to the Neighborhood Council as far as noise, lights and possible night-time disturbances to the residential area. *The plan, as submitted, is unspecific as to these areas.*

> The Planning Commission, during a recent General Plan update, expressed a desire for a motel that would have a minimum 100 units, would offer banquet-room and restaurant facilities; *they did not want to see the market for such undermined by a smaller facility that was of a small scale and did not offer these facilities.* Your facility appears that with a future addition this desire will be realized, although the Commission may want an assurance via design

that would not permit the second phase of the parcel to be used for a different use.

(Exs. 43, 297; letter from Barbara Schoetz, Urban Planner Department of Community Development to Mr. F.E. Britt, dated October 2, 1980, regarding Preapplication 80–9–22–57; emphasis added.)

Thus, at the earliest stages of the planning process, the two issues which ultimately derailed the Litton proposal—opposition from single family homeowners adjacent to the site and a concern that the Interim Use might undermine the market for construction of a major hotel—were pointed out to Litton.

On December 2, 1980 Litton purchased the parcel.

A second preapplication was filed January 13, 1981. (No. 81–1–13–04; Ex. 397). Unlike the first preapplication, this filing identified Litton as the applicant. The City responded to the preapplication by form letter on January 22, 1981. The Department of Community Development, after preliminary analysis "suggested that [Litton] give careful consideration" to some potential problems with the application. First, the Department recommended that a formal permit application not be submitted without changes because Litton needed to address questions concerning parking, architectural specifications, and the consistency of the proposal with the General Plan. Second, in the "comments" section of the form letter Department stated: "This project will likely preclude other hotel facilities in the future and must therefore meet Council policy concerning desired future facility (sic) along freeway corridor." (Ex. 44).

On May 1, 1981 Litton filed a formal application for a Commercial Industrial Planning Development Permit (hereinafter "permit") to build what it called a "hotel" on the parcel. (PD–S 469, Ex. 45). Robert Cottle, a planner from the City's Department of Community Development evaluated the application. During his review he suggested, and Litton agreed to, a number of modifications in the proposal. (e.g. Ex.

48). Ultimately Cottle recommended to his supervisors, Wayne Goldberg and Barbara Schoetz, that the application be conditionally approved. For a number of reasons, Cottle's supervisors disagreed with his recommendation. Their concerns related to the proposed Interim Use for the facility. Litton had proposed that initially fifty-three (53) rooms would be constructed which would be used for housing foreign (Saudi Arabian) students (hereinafter "Interim Use"). The Interim Use would last five years during which time the hotel facilities would not be open to the public. At the end of the five-year period Litton planned to construct forty-nine (49) additional rooms and the facility would then be operated as a normal commercial hotel. Among the Department of Community Development's ("Department") concerns was that the construction of the hotel on the Litton parcel would deter or preclude the construction of another hotel in the City while at the same time not providing any hotel facilities during the five-year Interim Use. The Department recommended to the Planning Commission that the application be denied as inconsistent with the City's General Plan and as detrimental to the needs of the community (i.e. the need for an operating hotel facility).

Litton officials were surprised by the recommendation of denial, but they should have known that the Interim Use might be of concern to the City. Schoetz's letter said that it might be a problem. More importantly, there were problems with the proposal on its face. Litton is fond of quoting City officials who spoke of the "desperate" need for a 100-unit hotel in the City. To Litton, it is incongruous that their proposal could have been turned down because of this desperate need for a hotel. But had Litton's proposal been approved, Litton would have constructed a fifty-three unit "hotel" that would still today be housing the visiting students. It would not be until 1986 at the earliest, according to the proposal, that the facility could be used as a hotel. It is not surprising then that a community which Litton admits had a "des-

perate" need for a 100-unit hotel would not approve a facility that would provide no hotel rooms for five years and might undermine the market for other hotel construction.

On July 9, 1981, during the Department's review of the application but before the Planning Commission meeting on the application, Litton's plans were disclosed to the neighborhood around the Litton parcel at a meeting of Neighborhood Council 1. There was an intense negative reaction to the proposal. The neighborhood did not like the idea of the facility housing Saudi Arabian military students in their neighborhood. They also objected to other aspects of the project. It is this outcry, and the subsequent permit denial, that form the basis of Litton's ethnic discrimination claim.

When the Planning Commission held its meeting to consider the application on September 23, 1981, the residents of the area surrounding the Litton parcel voiced their objections to the proposal again. After consideration of the report of the Department of Community Development and the opposition of the neighborhood to the proposal, the Planning Commission followed the recommendation of the Department and denied Litton's permit request. While it is not disputed that there were some anti-Saudi sentiments voiced at the meeting, there is clear evidence that the application would have been turned down regardless of the ethnicity or national origin (hereinafter "ethnicity") of the students. The concern about the five-year Interim Use for the hotel was expressed by the Department twice during the preapplication process before the public outcry against the Saudi students began. The City's denial of the application because of the Interim Use based on the lack of compliance with the General Plan was clearly not a pretext for discrimination against the proposal because of the ethnicity of foreign students. While discussed in more depth below, the evidence plaintiff Litton produced at trial failed to show that the City was motivated by discriminatory intent when it denied the application.

On October 12, 1981 Litton appealed the decision of the Planning Commission to the City Council. The appeal notice requested that the Council overrule the Planning Commission because Litton considered the "Commission's decision ... clearly erroneous as a matter of law under ordinances of the City of Simi Valley, California and law and statutes of the State of California." Litton did not mention the alleged discrimination against the Saudi students in the appeal notice. A Council hearing on Litton's appeal was scheduled for November 2, 1981.

In October, before the City Council meeting on the Litton appeal, Councilman Robert Huber met with the residents who lived around the Litton parcel to discuss their opposition to the development. He was told by residents that they did not want commercial development on the parcel.

In November the question of the Saudi students and the Interim Use became moot. As plaintiff Litton states:

At the November 2, 1981, City Council meeting, Clifford Evans of Litton stated the Saudi Arabian students would be housed elsewhere and requested that a permit be issued to Litton for the construction of the hotel. (Exhibits 401 and 175.) Litton had decided to house the Saudi Arabian students elsewhere in order to fulfill its timetable for housing the students under its contract with the Government of Saudi Arabia.

*Plaintiff's Amended Findings of Fact and Conclusions of Law,* ¶ 42. In Litton's view the proposal without the Interim Use had been acceptable to the Planning Commission and the Council should have issued the permit itself when the Interim Use was abandoned. In the City's view, the proposal to build a 102-unit hotel without the Interim Use was a new proposal which had not been considered by the Planning Commission and, therefore, was not properly before the Council.

The characterization of the Litton proposal without the Interim Use had several ramifications. Under Litton's view, the ap-

peal of the Planning Commission denial was still pending before the Council as was the application for a permit. Under the City's view, the appeal was abandoned as soon as the Interim Use proposal was dropped as was the application for a permit. The City Council and City Attorney stated the City's position to Litton's representative at the November 2, 1981 meeting explaining that the proposal without the Interim Use was considered a new project and would require a new application, a staff report on that application, and a review and recommendation from the Planning Commission. (Ex. 175). Litton never filed a new application. The City Council decided on November 9, 1981 that because Litton had modified its proposal by dropping the Interim Use that it had abandoned its appeal of the Planning Commission denial. While not disputing that it dropped its Interim Use, Litton maintains that it still wished to appeal and that its appeal was (and still is) pending before the Council. Litton took no further action on the permit application after the Council ruled the appeal abandoned on November 9, 1981. It is unclear why Litton did not refile a new permit application with the Planning Commission.

On November 23, 1981 the City Council conducted a hearing on the planning designation of the Litton parcel and, upon a motion from Councilman Huber, directed the Department of Community Development to consider a General Plan Amendment for the parcel. This amendment was labelled "GPA 821–9." The review of the parcel's General Plan status was a result of the concerns expressed by the neighborhood about the construction of a hotel in their area.

Clifford Evans of the Department of Community Development was assigned to conduct the staff study for GPA 821–9. On March 9, 1982 Litton was formally notified that the City was considering amending the General Plan and changing the land use designation of the parcel. In May of 1982 Neighborhood Council No. 1 voted in favor of changing the zoning of the parcel to "Intermediate Density Residential."

Litton wrote the City on May 7, 1982 objecting to the General Plan Amendment and offered to meet with the City to negotiate a mutually satisfactory development agreement. On May 19, 1982 the City responded to Litton stating that it had the power to change the planning designation of the parcel and would not negotiate with Litton until the General Plan Amendment had been considered.

On June 2, 1982 Litton sent a letter to the Planning Commission objecting to GPA 821–9. Ultimately, the Planning Commission, by a tie vote of 2 to 2 with one abstention, failed to take action on the proposed amendment.

Although there was no recommendation from the Planning Commission, the City Council considered the amendment at the August 9, 1982 City Council meeting. At that meeting an amendment to the General Plan changing the land use designation of the Litton parcel to Intermediate Density Residential was approved by a four to one vote of the Council and the General Plan was amended.

## III. PROCEDURAL HISTORY

After the amendment to the City's General Plan, Litton decided to pursue its case in court. On December 17, 1982 Litton filed the instant action against seven defendants—the City of Simi Valley, the City Council of the City of Simi Valley, Robert O. Huber, Ann Rock, Clyde Evans, Vicky Howard, and Greg Stratton. Litton alleged five claims and sought: (1) an Alternative Writ of Mandate under California law; (2) Declaratory Relief; (3) Damages under 42 U.S.C. § 1983; (4) Damages under 42 U.S.C. § 1985; and (5) Damages under a state promissory estoppel theory.

Jurisdiction over the § 1983 and § 1985 claims exists pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction over the state claims exists under the doctrine of pendent jurisdiction. Venue is proper in the Central District of California.

On March 28, 1983 this Court heard a Motion to Dismiss brought by all defend-

ants. Defendants argued that plaintiff failed to allege cognizable civil rights claims and that without the civil rights claims there was no jurisdictional base for the pendent state claims. The individual defendants further argued that they were absolutely immune from liability. The motion to dismiss was denied and a written order to that effect was entered on April 18, 1983.

On April 27, 1983 defendants answered plaintiff's complaint and responded to plaintiff's Petition for an Alternative Writ of Mandate. On May 31, 1983 this Court heard argument on a Motion for Summary Judgment brought by the five individual defendants again arguing that they were immune from liability because they were performing legislative acts. The Court denied the motion without prejudice finding potential genuine issues of material fact concerning the acts of the individual defendants and stated that the motion could be renewed after further discovery.

On June 20, 1983 this Court heard plaintiff's Petition for an Alternative Writ of Mandate pursuant to California Code of Civil Procedure § 1085 ("§ 1085") or, alternatively, plaintiff's request for a Mandatory Injunction pursuant to Federal Rule of Civil Procedure 65 ("Rule 65"). Plaintiff asked the court to compel the City to vacate and set aside the August 9, 1982 amendment to the General Plan. The court denied plaintiff's request finding that plaintiff had not met the requirements of either § 1085 or Rule 65. Under the state remedial standard plaintiff failed to show that the General Plan Amendment was procedurally improper or arbitrary and capricious. Under Federal Rule of Civil Procedure 65 plaintiff failed to show that the balance of the hardship tips decidedly in its favor and that there was fair chance of success on the merits. After the hearing on the Writ of Mandate the court considered dismissing the remaining state promissory estoppel claim, but ultimately decided to retain jurisdiction.

On February 8, 1984 the Court heard argument on a Motion for Summary Judgement filed by all defendants on all claims in the lawsuit and on May 17, 1984 the court issued an Order granting said motion in part and denying it in part. The court granted summary judgment for the five individual defendants finding that their actions as City Council members and staff were taken in the sphere of legitimate legislative activity and therefore they were entitled to absolute immunity under both state and federal law. The court denied the Motion for Summary Judgment on the state and federal claims alleged against the City. On May 29, 1984 the court denied plaintiff's request for reconsideration of the May 17, 1984 decision in granting summary judgment in favor of the individual defendants and on July 20, 1984 the case against the City came to trial.

## IV. LITTON'S CONSTITUTIONAL CLAIMS

Litton does not like General Plan Component 821–9, nor does it like the fact that its development permit application was denied. Therefore, Litton argues that there must be something constitutionally wrong with the City's actions. To reach this conclusion, Litton attempts to fit the facts of this case to constitutional doctrine as it has been applied in very different factual situations. In so doing, Litton tangles related but distinct strands of constitutional law (i.e. fundamental rights and intermediate tier equal protection analysis), needlessly stretching precedent in other areas to cover the questions in this case where clear constitutional law already exists.[3] All of Lit-

---

3. For example, Litton relies heavily on *J.W. v. City of Tacoma, Washington*, 720 F.2d 1126 (9th Cir.1983). In that case the court applied heightened scrutiny and struck down a city zoning ordinance that distinguished between group homes for newly released mental patients and other group homes. There are two differences

between *J.W. v. City of Tacoma, Washington, supra* and the instant case. In the instant case the alleged discrimination is against an ethnic group. Applying lower tiered equal protection analysis is not appropriate. Secondly, the defendant in the *City of Tacoma* case admitted that the ordinance discriminated between citi-

ton's constitutional claims are discussed *infra* but the heart of Litton's case is summarized below.

 In essence, Litton makes two federal constitutional claims, both under the 14th Amendment. First, Litton argues that the City's actions discriminate against the Saudi students, who in the original proposal would have resided in the planned hotel for five years. Ethnic minorities such as Saudi students are a suspect class under equal protection analysis and cannot be discriminated against unless there is a compelling state interest. It is *extremely* rare that courts find a state interest sufficiently compelling to justify discrimination on the basis of race or ethnicity. *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). Therefore it is almost guaranteed that if intent to discriminate on the basis of race or ethnicity is shown, a governmental enactment or action will be struck down. *E.g. Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). But when alleged discrimination, such as in this case, is neither admitted nor obvious from the face of a statute or ordinance, a plaintiff must prove intent to discriminate first before the burden shifts to the government to show that there is a compelling reason for the discrimination.

The standard for reviewing alleged racially or ethnically discriminatory zoning decisions was succinctly stated by the Supreme Court in *Vil. of Arlington Hts. v. Metro Housing Dev.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). To prevail on this Equal Protection claim Litton must prove that the City was motivated by discriminatory intent when it denied the permit application or when it adopted GPA 821–9. This question is addressed *infra*.

 Litton's other constitutional claim is that the constitutional rights of Litton as a corporation were infringed because the new land use designation for the Litton parcel was different than it previously had been and different than similarly situated parcels in other parts of the City of Simi Valley. But discrimination between parcels of land is the essence of zoning and decisions made by a community about how it wants parcels developed are generally presumed to be constitutional and will not be upset by a court unless they are "clearly arbitrary and unreasonable having no substantial relation to the public health, safety, morals or general welfare." *Village of Euclid v. Amber Realty*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926).

The court considers Litton's two constitutional claims below.

## A. *Ethnic Discrimination*

Litton argues that the City's decision to deny the permit application and to adopt GPA 821–9 was motivated by an intent to discriminate against Saudi Arabians. The City responds, *inter alia*, that there can be no basis for an ethnic discrimination claim because the new land use designation does not preclude constructing other housing for the Saudi students. Litton can still build condominiums as was its original plan.[4] The City misapprehends the constitutional standard this court must apply. If this court found that the decisions of the City in stopping the proposed Litton development were motivated by an intent to discriminate against Saudi Arabians, the City's action would be constitutionally infirm. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *Vil. of Arlington Heights, supra* 429 U.S. at 265, 97 S.Ct. at 563. This is true regardless of the parcel's current land use designation.

zens on the basis of a person's status as a newly released mental patient and that the ordinance was intended to so discriminate. In the instant case there is no ordinance that discriminates on the basis of ethnicity and no admission by the City that there was an intent to do so.

4. The logic of the city's argument suggests that it would be constitutionally acceptable to deny a building permit for low income housing solely because such housing was likely to be integrated as long as other housing could be built on the site. Such an action by the City would be unconstitutional.

Litton's first Equal Protection claim presents two questions—Does Litton have standing to raise it and, if so, did Litton prove discriminatory intent at trial?

### 1. Standing

There is little doubt that Litton has met the Article III standing requirements that it show injury that is likely to be redressed by a favorable decision on the merits. *Vil. of Arlington Hts. v. Metro Housing Dev.*, 429 U.S. 252, 260–63, 97 S.Ct. 555, 561–62, 50 L.Ed.2d 450 (1977) (hereinafter *"Arlington Heights"*).

■ However, in asserting the rights of the Saudi Arabian students Litton is not asserting its own constitutional rights but asserting the rights of third parties. This raises prudential considerations concerning third party standing. Even when Article III standing requirements are met "a plaintiff may still lack standing under prudential principles by which the judiciary seeks to avoid deciding questions of broad social impact where no individual rights would be vindicated and to limit access to federal courts to those litigants best suited to assert a particular claim." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). In a zoning situation similar to the instant case the Supreme Court discussed but did not decide the question of whether a developer like Litton could assert the rights of potential dwellers like the Saudi Arabians:

> As a corporation, [the plaintiff] has no racial identity and cannot be a direct target of [the city's] alleged discrimination. In the ordinary case, a party is denied standing to assert the rights of third persons. *Warth v. Seldin*, 422 U.S., at 499, 95 S.Ct., at 2205.

*Arlington Heights*, 429 U.S. at 263, 97 S.Ct. at 562. *Accord Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (a litigant "must assert his [or her] own legal interests rather than those of third parties"); *Construction Ind. Ass'n. Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 905 (9th Cir.1975) (no third party standing).

In *Arlington Heights* the court found standing for another plaintiff and thus did not reach the question of whether developers like Litton have such standing. Whether Litton should be allowed to assert the rights of Saudi Arabian students presents this court with a difficult question of constitutional adjudication. As is often the case, the distinguished commentators of Wright, Miller and Cooper provide helpful guidance. It should be remembered that this case presents two federal constitutional claims—Litton's right to be free of arbitrary or irrational zoning actions and the Saudi students right to be free of discrimination on the basis of their ethnicity.

> A litigant appears in court and seeks to challenge the validity of a statute or other governmental action. If validity were to be measured solely in light of the litigant's interests, the challenge would fail, or would require determination of difficult or sensitive questions. If validity is measured in light of the distinctively different interests of others, however, the challenge may succeed on theories that present more secure grounds for decision. Consideration of these other interests thus may lead to a different result or to a wiser safer basis for the same result. At the same time, consideration of those interests may make the task of decision more difficult and increase the risks of unnecessary or unwise decisions.

Wright, Miller and Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters 2d* § 3531.9 at 544.

■ As a constitutional matter it is likely to be easier for a litigant on the facts of the instant case to successfully set aside a governmental action on the basis of ethnic discrimination than arbitrary and unreasonable zoning. For that reason, and because there is some relationship between the rights of the Saudi students and the rights of Litton, this court assumes without deciding that Litton has standing to assert the rights of the Saudi students.

## 2. *Intent to Discriminate*

The City took two actions which Litton could claim unlawfully deprived it of its right to construct a hotel on the parcel— Litton's permit application was denied by the Planning Commission in 1981 and the General Plan designation for the property was changed by the City Council in 1982. As Litton dropped its proposed Interim Use of the facility for the housing of the Saudi students before the appeal of the Planning Commission's recommendation that the permit application be denied, the ethnic discrimination claim as a practical matter only relates to the motivations of the City in denying the permit.[5]

The Planning Commission held a public hearing on Litton's permit application (PD–S–469, Ex. 159) on September 23, 1981. The request by Litton was to construct a 102-unit hotel on the parcel in two phases. Phase One would be the construction of 53 rooms, a restaurant and recreational facilities and Phase Two, scheduled to occur five years later, would be the construction of the remaining rooms and conversion of the recreational room to a banquet facility. During the first five years, the facility would not be operated as a public hotel but would be used to house students studying at a nearby Litton facility. Because of the proposed Interim Use of the facility, the City's Department of Community Development recommended to the Planning Commission that the permit application be denied.

At the September 23, 1981 Planning Commission hearing Litton explained that during the interim five-year period the proposed "hotel" would be used primarily to house Saudi Arabian military students receiving technical training from Litton but also would house some American Litton employees and their families preparing for assignment in Saudi Arabia. (Transcript of September 23, 1981 hearing, Ex. 150).

The questions by the Planning Commissioners addressed to the Litton representative at the start of the hearing focused largely on how certain it was that within five years the facility would be converted into a hotel with one hundred rooms consistent with the goal of the General Plan. The Litton representative at the hearing assured the Commission that the conversion was a certainty but admitted that Litton would not run the hotel and that there had been no discussions with a potential purchaser about running the hotel. Litton also admitted that it was conceivable that the five-year Interim Use might be extended to as long as seven years. There was also an inquiry from a Commissioner about the impact of the American families on school enrollment in the City and a question about whether Litton would consider completing the entire project at once and open part as a hotel. Litton's representative indicated it could not do that.

During the public hearing on the application no residents spoke in favor of the proposal and many spoke against it. The public concerns are difficult to summarize because they were varied and numerous, but most addressed, in one form or another, a concern about a reduction in neighborhood property values that homeowners would face if the facility were constructed and a concern about safety and the quality of life in the neighborhood if a significant number of military students—males in their late teens and early twenties—were to move into the area. Other concerns included light pollution, the fence and elec-

---

**5.** It is noted for the record that the court has restructured Litton's case by focusing on the permit denial and the General Plan Amendment as separate issues. Litton's approach to the case has been to focus on the General Plan Amendment solely, pointing to the earlier permit denial as evidence of the unconstitutionality of the later decision to amend the General Plan. In the court's view, Litton's approach obfuscates the many issues in the case. When the City Council amended the General Plan in 1982, it did so in response to citizen opposition to commercial development in the neighborhood and because of general planning concerns. There is absolutely no evidence that ethnic discrimination was a factor. There is, however, a colorable claim that the 1981 permit denial was motivated by discriminatory intent. In fairness to plaintiff, the court has reviewed both the City's decisions to see whether ethnic discrimination was a motivating factor.

tric gate Litton planned to put around the facility, traffic, whether Litton would pay hotel taxes, and the potential for building to be vacant after the Interim Use. There were a few remarks which could be characterized as anti-Saudi made by members of the public at the hearing. One resident was concerned about "religious fanatics." Others were concerned about the instability of the political situation in the Middle East and the question of whether the presence of Saudi military students in their neighborhood might draw anti-Saudi government protestors. Many of the public concerns appeared to have nothing to do with the ethnicity of the students but the fact that there would be military students living in what the neighbors often referred to in their comments as "military barracks."

At the conclusion of the hearing the staff reiterated its recommendation to the Planning Commission that the permit application be denied as inconsistent with the General Plan goal of encouraging the development of a 100-unit hotel.

By a vote of 4 to 0 with one Commissioner absent, the Planning Commission voted to deny the permit as inconsistent with the General Plan. The decision turned on whether or not what Litton proposed could properly be considered a hotel and therefore consistent with the General Plan. The Commission ultimately concluded that it was not a hotel.

In determining whether the denial of the permit application was unconstitutional, this court must answer the factual question of whether ethnic discrimination was a motivating factor in the Planning Commission's vote. If it was, then the court will have to consider whether the discrimination was a "but for" cause of the denial, that is, whether absent discriminatory motives, the project would have been approved.

Plaintiff is not required "to prove that the challenged action rested solely on racially discriminatory purposes" but is required to prove that "discriminatory purpose was a motivating factor" in the decision. *Arlington Heights* 429 U.S. at 265, 270, 97 S.Ct. at 563, 566. However,

Proof that [a] decision ... was motivated in part by a racially discriminatory purpose [does] not necessarily [require] invalidation of the challenged decision. Such proof [ ], however, [shifts to the defendant] the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party ... no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

*Id.* at 270 n. 21, 97 S.Ct. 566 n. 21. *See also Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (constitutional principle sufficiently vindicated when plaintiff placed in no worse position than if impermissible motivation had not been considered).

██ The court finds, based on the transcript of the Planning Commission meeting and the testimony at trial, that the Planning Commission was not motivated by an intent to discriminate against Saudi Arabian when it denied the permit. The spontaneous comments of the Planning Commissioners at the meeting support this finding. Commissioner Howard reprimanded a resident at the hearing for discussing the religious affiliation of the students terming the comments "not appropriate." Commissioner Motylewski stated, "I just want to remark on a statement [made at the public hearing] that was not shared by me. I feel that anybody should be welcome to this community no matter of their ethnic race or religion." Finally Commissioner Howard remarked, "I happen to feel that the Saudis are a friendly nation to us. [During the gas crisis] I think the Saudis came through with some reasonably priced oil and probably pulled us out of a difficult situation. So I don't feel unfriendly towards them at all." The Commissioners also discounted or ignored other remarks made by residents at the hearing. They

expressed a lack of sympathy for residents who presumed that there would be a decrease in property values because of the hotel development noting that such a decrease could not be proved and they stated that some of the resident's concerns, *e.g.* neighborhood safety, were outside the jurisdiction of the Planning Commission.

The burden at trial was on plaintiff to prove an intent to discriminate on the basis of ethnicity. That burden was not carried. It is clear to the court based on the extensive evidence presented in these proceedings that the Planning Commission was not motivated by discriminatory intent when it recommended denial of the permit because of the proposed Interim Use.

Litton correctly points out in its post-trial brief that testimony by City officials that they had no intent to discriminate does not necessarily prove the lack of such intent. "If proof of a civil rights violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection." *Dailey v. City of Lawton, Oklahoma,* 425 F.2d 1037, 1039 (10th Cir.1970).

Litton incorrectly assumes, however, that proof of a few anti-Saudi statements by residents of Simi Valley is sufficient to prove that the actions of the Planning Commission and the City Council were motivated by discriminatory intent and, therefore, constitutionally infirm.

This court has weighed carefully the evidence in reaching its conclusion that the City's actions were not motivated by discriminatory intent. (*See supra* at pp. 278–282.) Based on the demeanor of the City officials who appeared as witnesses at trial, their testimony about why the permit was denied appeared credible and truthful. For example, Commissioner [now Councilwoman] Howard testified that the Interim Use would not have provided a badly needed hotel for the city. There is no reason to doubt her explanation for why she voted to deny the permit application. Importantly, her testimony and that of other witnesses is bolstered by extensive evidence—the transcript of the Planning Commission hearings and the City's responses to Litton's two preapplications—evidence that demonstrates that the concern that the Interim Use was inconsistent with the General Plan was not a post-hoc rationalization designed to cover up discriminatory motive but rather a concern of the City from the first day the project was proposed.

Plaintiff relies on *Flores v. Pierce,* 617 F.2d 1386 (9th Cir.1980) for the proposition that plaintiff has proved discriminatory intent at trial. *Flores* is on point as it illuminates factors that are important to consider in deciding whether intent to discriminate has been shown. *Flores* demonstrates the kinds of facts that are absent in the instant case. Procedurally the court in *Flores* affirmed a jury finding of intent by City officials to discriminate on the basis of race and national origin. Among other things the court noted that City officials had used "stereotypic reference to individuals from which the trier of fact could infer an intent to disguise racial animus." *Id.* at 1389. There were references to explicit racial characteristics in City reports. There were "significant departures from prior procedural sequences [in how plaintiffs were handled] which point toward discriminatory intent." *Id.* at 1390. Finally, the court concluded in effect that the City's actions in *Flores* were unexplainable unless one concluded that they were racially motivated. That is not the case in the instant case. The bottom line here is that the City's actions can be explained by a myriad of community and planning concerns having nothing to do with the ethnicity of the proposed hotel's temporary residents.

Even if Litton had been able to prove discriminatory intent, under the mixed motive standard established in *Arlington Heights, supra* and *Mt. Healthy, supra,* the court believes that ample evidence was presented to show that the ethnicity of the students was not a "but for" cause of the denial of the permit. The community opposition to the facility appeared to be generated by the non-traditional use of the facility as housing for military students. The

facility proposed would have been surrounded by a fence and electric gates. The General Plan did not contemplate the use of the parcel for such a "hotel" or dormitory and it did contemplate the possibility of a public hotel facility on the site. Stripped of the labels attached to it (e.g. Interim Use, non-traditional use) Litton's proposal was to build residential housing on land zoned for commercial development. Labelling such residential housing as a hotel did not make it a hotel nor did the commitment to convert the property to a hotel five to seven years later. The court finds the General Plan considerations motivated the Planning Commission to deny the permit for the non-traditional use and would have regardless of the ethnicity of the students.[6]

Litton appealed the Planning Commission's permit denial to the City Council, but immediately before the appeal was scheduled to be heard on November 2, 1981, Litton withdrew the proposed Interim Use and stated it simply wanted to build a hotel immediately for public use. A letter from Litton to that effect was read into the record of the council meeting. In other words, Litton requested from the council a permit to build a 102-unit hotel deleting both the proposed five-year Interim Use and the proposed perimeter fencing and security gates from the original application. The City Attorney advised the City Council regarding the change in the Litton appeal as follows:

> [G]enerally the Planned Development permit process is left to the Commission unless it is appealed to the Council. If you find that there has been no change in the plans of Litton Industries, but there's some fact that you want the Commission to consider you can refer it back, and I would not discuss it at this moment until they've had an opportunity to review it. If you find that it is a new ... plan

they're developing, then again I would not discuss it tonight, I would refer it back to the Planning Commission so that they can take their initial look at it as they are supposed to do.

(Ex. 175.)

There was a lengthy discussion at the November 2, 1981 Council meeting about what action the Council should take regarding the Litton appeal in light of the change in the Litton application. The Department of Community Development recommended Planning Commission review of the new proposal which staff indicated could be completed in less than ninety days. Ultimately, the Council voted to rule the appeal abandoned and directed Litton to file a new permit application with the Planning Commission if it wished to build the hotel. The Council members reasoned that the Planning Commission's denial of the permit due to Phase 1 (the Interim Use) of the facility did not mean that they found Phase 2 (the proposed 102-unit hotel) fully acceptable and consistent with the General Plan and other planning requirements. The Council members felt that it was the Planning Commission's job to decide whether or not a permit should be issued. As Councilman Gallegy explained to the Litton representative, "we cannot deal with something that the Planning Commission has not reviewed. [That] is the whole purpose of having a Planning Commission to start with." Litton never filed a new application for a permit with the Planning Commission.

For Litton this interaction with the Council is of some legal significance but for the court it is not. First, the ruling that the appeal had been abandoned could not have been motivated by discrimination as there was no longer a proposal to house the Saudi students in Simi Valley. Second, and more importantly, Litton has not advanced any colorable constitutional claim under

---

**6.** Additional evidence supporting the finding is the continued community opposition to commercial development on the parcel even after the Interim Use was dropped.

It should be noted that it probably would have been constitutionally acceptable for the City to zone the property so that no students—military

or otherwise—could live in dormitories or boarding houses in the neighborhood as long as the City did not infringe on other protected rights in the process. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (ordinance prohibiting boarding houses in entire village upheld).

which it would be improper for a City Council, on advice of counsel, to require Planning Commission approval of a permit application, a standard procedure of the City.

Litton has failed to prove any constitutional problem with the City's decision to deny it a permit to build its proposed two-phase project on the Litton parcel. As Litton voluntarily dropped its proposed Interim Use, there can be no substantial claim that the City's later action in amending the General Plan and reclassifying the parcel from commercial to residential were motivated by ethnic discrimination.

## B. The General Plan Amendment

General Plan Amendment 821–9 changing the land use designation of the Litton parcel from General Commercial with a Hotel/Motel Node to Intermediate Density Residential was adopted by the City Council on August 9, 1982. Litton challenges the constitutional propriety of the City's decision to change the parcel's land use designation arguing the City's action deprived Litton of its Fourteenth Amendment rights to Equal Protection and Due Process.

 It is well established law that "a municipal zoning ordinance will not be held unconstitutional if its wisdom is at least fairly debatable and it bears a rational relation to a permissible state objective. Constitutional scrutiny of zoning regulations is heightened, however, when the regulations infringe on a fundamental interest or discriminate against a suspect class." *J.W. v. City of Tacoma, Wash.*, 720 F.2d 1126, 1128 (9th Cir.1983) (citations omitted). In its legal arguments Litton attempts to establish that this court should apply heightened constitutional scrutiny to the City's decision to amend its General Plan. As discussed *infra*, that attempt fails. Zoning decisions of local governments are presumptively constitutional and will not be set aside by a court unless those decisions are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

*Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). "The scope of federal court review of zoning decisions generally is extremely narrow." *J.W. v. City of Tacoma, Wash.*, 720 F.2d 1126, 1130 (9th Cir. 1983). Before analyzing Litton's constitutional claims and reviewing the City's decision under the *Euclid* standard, the court summarizes for the record the history of GPA 821–9 from its inception to its adoption.

### 1. History of GPA 821–9

The first mention of a General Plan Amendment for the Litton parcel occurred during the November 2, 1981 hearing on Litton's aborted appeal of the Planning Commission's permit denial. With the Director of Real Estate for Litton Industries Clifford Evans present, Councilman Huber, who had met with neighborhood residents approximately two weeks earlier, stated that there was a strong feeling in the community that the General Plan Amendment in 1980 that designated the Litton parcel as General Commercial with a Hotel/Motel Node had occurred with insufficient notification of the proposed amendment to the surrounding neighborhood residents. Huber stated that the City, consistent with the law at the time, elected not to notify the residents by mail during the 1979 and 1980 General Plan update process and that he considered the process unfair because the residents were not so notified. Because of this, Huber stated that he would like to see a General Plan Amendment to review the parcel's land use designation.

On November 23, 1981 the Council held a public hearing on the question of a General Plan Amendment. The public sentiment was that the construction of a hotel on the parcel was incompatible with the surrounding residential uses and that some other land use designation, such as Office Commercial, would be more appropriate. There was criticism of the 1980 General Plan update process and were requests for a General Plan Amendment. By a 5–0 vote the Council authorized a Council sponsored

General Plan Amendment for the Litton parcel. Staff was directed to look at different land use alternatives for the property.

Pursuant to normal procedures, the staff report on the Council sponsored General Plan Amendment ("GPA 821-9") was presented to the Planning Commission on June 2, 1982 and the staff recommended redesignating the Litton parcel from "General Commercial" to "Intermediate Density Residential." The staff considered three designations as an alternative to the General Commercial designation. They were High Density Residential, Intermediate Density Residential and Commercial Office. Because the staff considered High Density Residential use to be inconsistent with the adjoining single family homes, only the two latter land use designations were discussed in the report to the Planning Commission. At the time of the report the land to the north of the parcel (across Alamo Road) was designated Intermediate Density Residential and was vacant. It now contains a 34-unit multi-family residential development. The land to the south was an off-ramp of the Simi Valley Freeway and south of the freeway was a shopping center. East of the parcel was designated Medium Density Residential and contained single family homes. West of the parcel (across Erringer Road) was designated General Commercial and housed a racquetball and tennis facility and vacant land. After considering traffic, freeway noise, the interface with the residential neighborhood to the east, and the existing supply of Commercial Office property in the City, the staff recommended that the land use designation for the parcel be changed to Intermediate Density Residential. The staff added in its statement to the Commission "the General Plan also states that higher density residential uses should be located on the valley floor, which this parcel is, near convenience shopping and on major arterial streets, which it is also."

Rick Jensen, the Real Estate Manager for Litton Industries read a statement from Wayne L. Grovenor, Senior Vice President and Controller of Litton Industries, at the hearing but refused to answer any questions. Litton opposed the change in the land use designation and said the value of the property would decrease $600,000 if the land use designation was modified and that such action might constitute inverse condemnation. Litton believed its investment expectations were not being protected and urged the Commission not to change the land use designation.

Counsel for the Planning Commission then advised the Commission that a zone change was permissible "so long as a legitimate interest is obtained which will benefit the health, safety, and general welfare of the City."

After citizen testimony supporting the staff recommendation, the hearing was closed and the five Planning Commissioners expressed their views on the appropriate land use designation. (Transcript, Ex. 185). All expressed the view, in varying degrees, that what the appropriate land use for the parcel was a close question. Two commissioners, Commissioners Maitland and Piper, announced that they supported retaining the commercial designation. Three Commissioners—McAdoo, Corrigan, and Motylewski—expressed support for changing the designation to Intermediate Density Residential. Arguments in support of retention of the commercial designation were that land adjacent to a freeway off-ramp was not the best place for residential development (though Commissioner Piper noted it was better suited for residential development than land immediately adjacent to the freeway), the land use designation was a close question and in those instances the continuity of the General Plan should be preserved rather than disturbed, and that the change might deter any development on the land at all. Arguments in support of changing the designation were that similar property in the City was not designated General Commercial, there was a need for affordable housing, and that the surrounding area was basically residential.

The only vote by the Commission was on a motion by Commissioner Maitland to re-

tain the General Commercial designation but remove the Hotel/Motel Node. That motion carried 3 to 2 with Commissioners McAdoo and Corrigan voting no. Despite Commissioner Motylewski's statement earlier in the hearing that he would support the staff recommendation of the Intermediate Density Residential, he voted with Commissioners Piper and Maitland to retain the General Commercial designation, albeit without the Hotel/Motel Node.

After the meeting, Commissioner Piper reconsidered his vote and decided to abstain because of a possible conflict of interest. A relative of his worked for Litton. The vote was retaken June 24, 1982 and was 2 to 2 with one abstention and the motion failed. Technically, there was then no recommendation from the Planning Commission to the Council regarding a proposed General Plan Amendment.

Commissioner Piper apparently did not consider recusing himself before the discussion of the General Plan Amendment on the Litton parcel. He had been an active participant in the Commission discussion of what the appropriate land use designation should be and played an influential role in the voting on the amendment.

Despite Piper's recusal and the lack of a recommendation on the General Plan Amendment from the Planning Commission, the matter was not taken up again by the Commission. The matter was next considered by the City Council. Because there was no recommendation to change the General Plan, the issue came before the City Council as an application to retain the existing General Plan status of the parcel (*i.e.* General Commercial with a Hotel/Motel Node).

The Council meeting and a public hearing on GPA 821–9 was held August 9, 1982. Citizen testimony supported the Intermediate Density Residential classification. Concerns expressed included lack of notice to the residents when the 1980 General Plan update was adopted, traffic, the lack of need for commercial development on the parcel given its proximity to a shopping center already serving the neighborhood,

and a desire by residents to avoid evening activity at the site which would conflict with the residential character of the neighborhood. There was a general concern that commercial development adjacent to single family residences was an incompatible use.

Litton's representative at the meeting, Clifford Evans, opposed any change in the designation for the parcel. He noted that the commercial designation was the most versatile, that there was another hotel being proposed in the City (implying that the site would not be used for that purpose), and that there was no precedent for a change in the designation of that property. Evans further stated that of the 36 corners in the City adjacent to a freeway interchange, 17 were designated commercial and were adjacent to residential areas and 8 were designated residential. Finally, Evans noted that changing the designation would reduce potential real estate tax revenue and, because of the investment Litton had made in purchasing the property, residential zoning, in his view, would effectively zone the property as a vacant lot.

The Council struggled with what to do with the parcel, many members expressing their frustration about what the appropriate land use designation was. Councilman Huber said he vacilated between supporting Intermediate Density Residential and Commercial Office. Councilwoman Howard, a former Planning Commissioner who had considered the original Litton application, noted an irony in the situation:

> [Before the hotel proposal] I don't think anybody was aware that the neighborhood did not like the commercial designation that was on that property. It wasn't until the controversial Saudi boarding student building came in for approval, called a hotel/motel at that time, that it became a really controversial situation. It's a little bit ironic to me that I think the real reason that the Planning Commission [at] that time turned it down was because we did not feel that it really was a true motel or hotel that was coming in, and it was really a housing situation.

And now, ironically, we have a designation sought by the neighborhood that probably would have housed those students if it went to intermediate density at that time ... they could have built a condominium type development and put students into it.

(Transcript, Ex. 192). Councilwoman Howard also expressed a preference for either Intermediate Density Residential or Commercial Office.

Councilwoman Rock asked the staff to compare the traffic impact of the two alternative designations and stated she favored Intermediate Density Residential because that was the preference of the neighborhood and because she believed such a designation would preserve the characteristics of the neighborhood, a General Plan consideration.

Mayor Gallegy was the final Councilperson to state his views at the meeting. He recalled the uproar over the "Saudi barrack type thing with all male students in a residential neighborhood where they're family oriented" and the statement made by residents at earlier hearings that all the residents really wanted was to remove the Hotel/Motel Node. He expressed his view that the residential use for the parcel was incompatible with its location next to a freeway off-ramp. He thought that the neighborhood concern about the interface between commercial development and the single family homes could be addressed by the buffer between the developments that that issue could be examined when there was an application for a development permit. By a vote of 4 to 1—Councilpersons Stratton, Huber, Rock, and Howard in the affirmative and Mayor Gallegy voting no—GPA 821–9 was adopted changing the land use designation of the parcel from General Commercial with a Hotel/Motel Node to Intermediate Density Residential.

### 2. *Litton's Claims*

As a matter of hornbook law, the authority of this court to set aside the City of Simi Valley's decision about how to zone the Litton parcel is very limited:

A zoning ordinance is a legislative act. It represents a legislative judgment as to how particular land should be classified, where zoning boundaries should be drawn, and the nature and extent of the restrictions which should be imposed. The authority to zone the territory of a municipality, and necessarily the authority to determine the nature and extent of such zoning, are vested in the legislative body. Accordingly, a legislative decision in such matters may not be disturbed unless the legislature has exceeded its powers or has acted in an arbitrary or unreasonable manner. Legislative judgment in a zoning matter may not be annulled solely because a court disagrees with the wisdom of such judgment.

R. Anderson, *American Law of Zoning 2d*, § 3.14. *See Ybarra v. Town of Los Altos Hills*, 370 F.Supp. 742, 748 (zoning ordinances presumed constitutional; due process satisfied unless ordinance clearly arbitrary and unreasonable) *aff'd* 503 F.2d 250 (9th Cir.1973).

Litton makes seven arguments for why the City's zoning decision should be given closer than normal scrutiny by this court. They are:

(a) Under Equal Protection analysis GPA 821–9 is subject to strict scrutiny and must be set aside unless the City can demonstrate a compelling governmental interest;

(b) Under Equal Protection analysis GPA 821–9 is subject to intermediate scrutiny and must be set aside unless the City can demonstrate the furtherance of an important governmental interest;

(c) GPA 821–9 is an unconstitutional Bill of Attainder;

(d) Litton's procedural due process rights were violated by GPA 821–9;

(e) Even if GPA 821–9 was constitutionally proper, it violated 42 U.S.C. §§ 1981, 1982, 1985, 1986, the Fair Housing Act and the antitrust laws;

(f) GPA 821–9 violated California law;

(g) The City was estopped from passing GPA 821–9 under California law.

These legal contentions are dealt with in turn below. None are applicable to the instant case. The City's decision can only be given the normal degree of scrutiny courts normally give zoning decisions. The pendent state claims are dealt with in the following section of the opinion.

### (a) *Strict Scrutiny*

 The City's actions would only be subject to strict scrutiny if Litton proved an intent to discriminate against a suspect class or the action infringed on a fundamental interest. This court has already found that the City was not motivated by an intent to discriminate against Saudi Arabians when it denied the permit for the construction of Litton's proposed hotel. Similarly, the City was not motivated by such an intent when it adopted GPA 821–9. There is little, if any, evidence that when the City Council adopted GPA 821–9 they were motivated by anything other than general planning considerations and a responsiveness to a desire by residents in the neighborhood to stop commercial development on the parcel. The General Plan Amendment was proposed and adopted after Litton dropped its proposed Interim Use involving the Saudi students. While the controversy over the land use designation for the parcel may have arisen because of the proposed Interim Use (Litton's proposal was apparently the first development proposal for the parcel subsequent to the 1980 General Plan update) there was no evidence that it had anything to do with the Council's final decision to amend the General Plan. Although not characterized as such in Litton's pre and post trial briefs, Litton's ethnic discrimination claim is in essence a challenge to the City's 1981 action in denying the permit. The 1982 decision by the City was clearly not motivated by an intent to discriminate against a suspect class.

Similarly, the City's action in designating the parcel for residential housing rather than commercial development (*e.g.* a shopping center or hotel) did not infringe on any recognized fundamental interest of Litton. *Cf. Schad v. Mt. Ephraim,* 452 U.S.

61, 108 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (First Amendment rights a fundamental interest); *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (right to associate with one's family a fundamental interest). Therefore, the City's action amending the General Plan is not subject to strict scrutiny.

### (b) *Intermediate Scrutiny*

Litton relies on *Cleburne Living Center, Inc. v. City of Cleburne,* 726 F.2d 191, 735 F.2d 832 (5th Cir.1984) *aff'd,* ___ U.S. ___, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) for the proposition that the City's action in amending the General Plan constitutes discrimination against a quasi-suspect class. *See also J.W. v. City of Tacoma, Wash.,* 720 F.2d 1126 (9th Cir.1983). These cases involve the special scrutiny appellate courts have given decisions made by local governments concerning homes for the mentally retarded. These cases are not directly relevant to a review of whether the City of Simi Valley made a proper decision about whether Litton International Development Corporation could build a hotel, shopping center, office building, or condominiums on a parcel of land. Additionally, the Supreme Court recently rejected the approach followed by the Fifth Circuit in *Cleburne.* The Supreme Court applied the rational relation test rather than higher level scrutiny.

### (c) *Bill of Attainder*

 "Legislative acts, no matter their form, that apply either to named individuals or to easily ascertainable members of a group in such ways as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *U.S. v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). Litton's argument that GPA 821–9 was an unconstitutional Bill of Attainder is without merit. First, a Bill of Attainder by definition involves an intent to punish and none was shown here. *Selective Service System v. Minnesota Public Interest Research*

*Group,* 464 U.S. 1006, 104 S.Ct. 522, 78 L.Ed.2d 707 (1984). Second, Litton's argument proves too much. If a change in the land use designation of a parcel of land is a Bill of Attainder, a city would never be able to change the land use designation of a parcel once one was chosen.

### (d) *Procedural Due Process*

The basic elements of procedural due process are notice and an opportunity to be heard. Litton was notified of the hearings by the Planning Commission and the City Council on GPA 821–9. It offered evidence at both hearings. Nonetheless Litton argues that it was denied due process because it was denied a *meaningful* opportunity to be heard. Litton argues the hearings were perfunctory because there was a presumption from the day the amendment was proposed by Councilman Huber that the General Commercial designation should be changed.

█ Assuming *arguendo* that a General Plan Amendment creates a federal constitutional right to notice and hearing to all property owners affected by the Amendment, it cannot be said that Litton's rights were violated. Procedural due process does not guarantee Litton an unbiased staff report from the Department of Community Development as Litton argues. It guarantees Litton the right to criticize that report before the decision-making body. Litton was provided that right and exercised it. In fact, Litton convinced the Planning Commission to reject the Department's recommendation. The notice and hearings provided by the City to Litton did not deny Litton its right to procedural due process. *See Contra Costa Theatre, Inc. v. City of Concord,* 511 F.Supp. 87, 89–91 (N.D.Cal.1980).

### (e) *Alleged Statutory Violations*

█ The remainder of Litton's arguments for heightened scrutiny or damages under § 1983 _____ arguments alleging violations of a variety of federal civil rights statutes, the Fair Housing Act, and the antitrust laws _____ can be disposed of with brief comment. Litton failed to prove discrimination by the City at trial and therefore statutes providing damages for such discrimination do not come into play. While Litton may have standing to sue under the Fair Housing Act, *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), there is no conceivable way the City could have violated the Fair Housing Act, 42 U.S.C. § 3604, by changing a parcel's land use designation as the City did here from General Commercial which did not allow residential development to Intermediate Density residential which does. While a City has "a statutory obligation to refrain from zoning policies that effectively foreclose the construction of any low cost housing within its corporate boundaries," *Metropolitan Housing Development Corporation v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977), *cert. denied* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), there is no similar statutory obligation to allow hotel construction. Finally, there is no evidence in this case to support a finding of a conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1, as Litton argues. Litton offered no evidence whatsoever that the City's action in amending the General Plan was in concert with hotel developers attempting to reduce competition in the region.

### 3. *Was GPA 821–9 Arbitrary or Unreasonable?*

In reviewing the General Plan Amendment, this case boils down to the question "Was the City's action arbitrary or unreasonable?" In answering the question of whether Simi Valley properly changed the land use designation of the Litton parcel from commercial to residential, the court faces the same kind of question the Supreme Court faced nearly sixty years ago when it reviewed a plaintiff's claim that the Village of Euclid had violated his contitutional rights by placing his land in a zoning district zoned residential.

█ Before considering whether the City's action in amending the General Plan

was arbitrary and unreasonable, it should be noted that Litton does not claim that the City's action constitutes an unconstitutional taking without compensation. Denying an owner the best or most profitable use of its property or causing a dimunition in property value alone does not constitute a taking. There must be a showing that the land was left with no remaining significant value. *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *e.g. Hamilton Bank of Johnson City v. Williamson County Regional Planning Commission,* 729 F.2d 402, 406 (6th Cir.1984) *rev'd* ___ U.S. ___, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *cf. Martino v. Santa Clara Water District,* 703 F.2d 1141 (9th Cir.1983) (taking can occur when condemnation proceedings delayed). In the instant case the Litton parcel remains valuable with the Intermediate Density Residential land designation. Litton's witnesses testified its current value is $480,000 and that Litton has received offers of $500,000. The City's expert testified that the parcel's value was $580,000. Whatever the exact value, the parcel still has significant value and there has been no taking.

■ Any doubts about the viability of the above precedents under current law in the 9th Circuit are clearly put to rest by the recent decision *MacLeod v. Santa Clara County,* 749 F.2d 541 (9th Cir.1984). The Litton parcel still has economically viable uses, and, under the law of this circuit there has not been a significant interference with investment backed expectations amounting to a taking. *Id.* at 549, n. 8. The Supreme Court's recent reversal in *Hamilton Bank of Johnson City, supra,* demonstrates hypothetically what a plaintiff must show to make out a taking claim.

■ To find GPA 821–9 unconstitutional under the *Euclid* standard Litton was required to show, and this court is required to find, that the land use designation is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety morals or general welfare." *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1928). There has been no such showing. The merits of GPA 821–9 are fairly debatable and this court will not substitute its judgment for that of the City Council.

> Being neither a super legislature nor a super zoning board of appeal, a federal court is without authority to weigh and reappraise the factors considered or ignored by the legislative body in passing the challenged zoning regulation. The reasonableness, not the wisdom, of the [zoning] is at issue ...

*Construction Ind. Ass'n, Sonoma Cty. v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975). If there is any legitimate public interest supporting the zoning decision, it is not lacking in due process and must be upheld. What constitutes public interest has been defined in exceedingly broad terms. "It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well balanced as well as carefully patrolled." *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed.2d 797 (1974).

The City of Simi Valley made a decision in 1982 to amend its General Plan so that the Litton parcel could only be used for residential development. As discussed, *infra* and as held by this court when it considered plaintiff's Petition for a Writ of Mandate, the amendment to the general plan was in compliance with state law. The City Council decided largely because of concerns expressed by the community, that the General Commercial designation for the parcel which had been put in place two years earlier, was inappropriate given the uses of surrounding property. The decision of City Council would have to be deferred to by this court even if there was one legitimate public purpose for the change. Here there are several. The neighborhood was residential in character and wished to keep it that way. Some members of the council were concerned

that there was insufficient public notice when the 1980 change in the status of the parcel was made. In fact, there were many amendments to the General Plan during 1981 and 1982 as parcels with problematic land use designations under the 1980 General Plan were found throughout the City. Clyde Evans, a City Planner testified that there were at least three other amendments to the General Plan after the 1980 update. The council considered the neighborhood concerns that evening activity on the site was incompatible with the surrounding residential use and the council considered Office Commercial as an alternative but decided there was insufficient demand for such property in the City. In sum, the Council balanced a variety of factors in coming up with the ultimate General Plan status for the Litton parcel.

■ The strongest argument that Litton makes is that the location of the parcel adjacent to a freeway made it unreasonable for use as residential property. This argument, however, falls short of showing unreasonableness in a constitutional sense in that there is much other property in the community used for residential purposes, or designated for that use in the General Plan, that is adjacent to the Simi Valley Freeway.

It is true as Litton argues that the Freeway Corridor Specific Policies for the Community suggest that parcels adjacent to the freeway should not be used for residential development, but it is also true that there is much residential development along the freeway, including next door to the Litton parcel. The council had to balance two competing interests—the compatability between development on the undeveloped parcel and existing use of the surrounding parcels on the one hand, and the desire to reduce residential development along the freeway on the other. In this case the council balanced these interests and made a legislative decision that neighborhood compatability was the more important of the two. One council member voted against the General Plan amendment believing the other interest was more important. The

Council's decision cannot be considered unreasonable or arbitrary. Litton in fact wanted to build what it considered to be a high quality hotel on land—a facility for sleeping and recreation. If the land was suitable for that purpose, it is not unreasonable that the land be used for residential purposes.

"In testing zoning ordinances ... the sole question is whether there is a rational relationship between the ordinance and the promotion of some aspect of the City's police power—a label which describes the full range of legitimate public interests." *Store v. City of Maitland,* 446 F.2d 83, 87 (5th Cir.1971). The City of Simi Valley had a number of legitimate reasons for zoning the property Intermediate Density Residential. The wisdom of that decision is fairly debatable and GPA 921–9 cannot be considered arbitrary and unreasonable.

## V. LITTON'S PENDENT STATE CLAIMS

Litton's complaint raised two issues of state law: (1) Whether the court should issue a Writ of Mandate under California Civil Code § 1085 ("§ 1085") ordering the City to vacate and set aside GPA 821-9; and (2) Whether the City was estopped from changing its General Plan under a theory of promissory estoppel. On June 28, 1983, a year before the trial, the court denied Litton's request for a § 1085 Writ of Mandate ruling that Litton had failed to demonstrate that GPA 821–9 was procedurally improper or arbitrary and capricious. Having decided one of the two state law issues, the court raised the question at the June 28, 1983 hearing why the remaining state law claim for promissory estoppel should not be dismissed under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In the Court's June 28, 1983 Order denying the issuance of a Writ of Mandate, an Order to Show Cause why the remaining pendent state claim should not be dismissed was issued. In its response to the Order Litton stated, "No productive purpose would be served by severing and dismissing plain-

tiff's fifth cause of action alleging promissory estoppel." *Plaintiff's Response to Order to Show Cause Re: Pendent Jurisdiction* at 1. The court ultimately retained jurisdiction over the promissory estoppel claim.

As the litigation progressed, plaintiff's theories of relief have expanded beyond the single state law claim. Because the issues have been briefed and evidence presented, this court considers below the state law claims, in addition to promissory estoppel, that Litton implicitly raises in its pleadings. The state clams can be best understood by examining the remedies plaintiff sought in its original complaint—injunctive relief (a Writ of Mandate) under its first claim and damages under its fifth claim (*i.e.* its promissory estoppel claim).

### A. *Damages*

Under California law, there is a very limited right to damages in zoning cases. Like the federal inverse condemnation standard, diminution in the value of land is insufficient by itself to make out a compensable taking claim.

As the California Supreme Court has written:

> [T]he courts of this state and the United States Supreme Court [have] firmly rejected the notion that the diminution of the value of previously unrestricted land by the imposition of zoning could constitute a taking impermissible in the absence of compensation. We have long adhered to that position.

*HFH, Ltd. v. Sup. Ct. of L.A. County,* 15 Cal.3d 508, 125 Cal.Rptr. 365, 542 P.2d 237 (1975) ("*HFH, Ltd.*"). Later in the opinion the court wrote:

> Plaintiffs complain that the city had concluded that its interests would best be served by residential rather than commercial development of the tract in question. Unable to make the desired profit from the sale of their land, they now seek to recoup it from the city; in so doing they mistake the law.

*Id.* at 375, 542 P.2d at 247. Litton has neither alleged nor made out a taking claim under the California Constitution.

Litton has alleged arbitrary zoning, but under state law damages are not appropriate relief for such a claim. As the *HFH, Ltd* court noted:

> We have recognized mandamus as the proper remedy for alleging arbitrary or discriminatory zoning and have in appropriate cases struck down land use restrictions which suffered from procedural or substantive deficiencies....
>
> \* \* \* \* \* \*
>
> Legislative acts, even if improper, find their judicial remedy in the undoing of wrongful legislation, not in money damages ... Thus acts within the area of legislative or administrative discretion have long enjoyed the shelter of immunity from tort liability ... the California Tort Claims Act ... provides that "[a] public entity is not liable for an injury caused by adopting or ... failing to adopt an enactment ..." (Gov't Code § 818.2)

*Id.* at 369 and 373, 542 P.2d at 241 and 245. *See also* Gov't.Code § 818.4. Assuming Litton could show arbitrariness, damages are not a remedy under state law.

 The final theory this court must consider is equitable or promissory estoppel. Invocation of this doctrine against government is only appropriate "where justice and right require it." *Palo Alto Inv. Co. v. County of Placer,* 269 Cal.App.2d 363, 366, 74 Cal.Rptr. 831, 833 (1969). The four elements of estoppel are that (1) the party to be estopped must be apprised of the facts; (2) such party must intend that his conduct be relied upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely on the conduct to his injury. *Shamrock Development Co. v. City of Concord,* 656 F.2d 1380, 1386 (9th Cir.1981) (reversing a jury finding of estoppel); *Driscoll v. City of Los Angeles,* 67 Cal.2d 297, 61 Cal.Rptr. 661, 431 P.2d 245 (1967).

■ Litton's estoppel claim for damages alleges that, "Defendants knew, or should have know[n], that Litton would have reasonably relied on their representations [that the proposed project was acceptable to the City] before it purchased the subject parcel. Litton was reasonably entitled to expect that the General Plan's commercial designation on the subject parcel would not be changed ..." Complaint at ¶ 29.[7]

No evidence was presented that anyone from the City directly represented to Litton that the General Commercial designation would never change. Even if such a representation had been made it would not have been reasonable for Litton to rely on it. General Plans are not cast in stone. Both the statutes and the caselaw make it clear that "The [general] plan may be changed after notice and hearing if the legislative body deems a change to be in the public interest ([Government Code] § 65356.1)." *Selby Realty Co. v. City of San Buena Ventura*, 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111 (1973). Moreover, there was no evidence that anyone from the City knew before Litton purchased the parcel that the General Plan would be amended. An essential element of estoppel is that the party to be estopped was apprised of the facts. No one from the City knew that the amendment would be proposed. Litton's claim asks this court to find that someone on the City staff could predict the future and did not disclose that prediction to Litton. This is simply not a tenable contention.

■ A more sensible estoppel argument is implicit in Litton's case, though not expressly stated. The argument concerns the 1981 permit denial, not the 1982 General Plan amendment. Litton could have argued that it relied on the generally favorable reaction to its project before it purchased the parcel, a project the City ultimately found inconsistent with the General Plan. This estoppel argument, however, is also without merit on the facts of this case. Representations by city staff during the preapplication process that it appeared that the Planning Commission would, with changes, find the project acceptable were merely staff opinions. Expression of an opinion is not a basis for estoppel as a matter of law. *Gilbert v. City of Martinez*, 152 Cal.App.2d 374, 313 P.2d 139 (1957). Additionally, City Staff disclosed to Litton that there might be problems with Litton's non-traditional use of the property. Litton took the risk when it purchased the property that the Planning Commission would ultimately decide that the Interim Use would undermine the market for a hotel in the City.

Finally, it is doubtful as a matter of law that statements by City employees to a developer could bind the City to approve the project thereby taking away the Planning Commission's right to review development proposals. Such an action by a court would "result in the nullification of a strong rule of policy adopted for the benefit of the public" and under such circumstances, estoppel is not appropriate against governmental entities. *Long Beach v. Mansell*, 3 Cal.3d 462, 91 Cal.Rptr. 23, 476 P.2d 423 (1970); *Strong v. County of Santa Cruz*, 15 Cal.3d 720, 125 Cal.Rptr. 896, 543 P.2d 264 (1975).

The preapplication process of the City is designed to advise developers on how the City will react to their projects not to guarantee approval of those projects. Litton was not ignorant of this fact when it received the City's response to its preapplication (Ex. 43). The City officials did not withhold or misrepresent any facts to Lit-

---

7. Litton does not argue, nor could it, that it had a vested right in the retention of the General Commercial land use designation. Such a vested right only exists when a property owner "has performed substantial work and incurred substantial liabilities in good faith reliance on a permit issued by government." *Avco Com. Developers v. South Coast Reg. Com'n*, 17 Cal.3d 785, 791, 132 Cal.Rptr. 386, 553 P.2d 546 (1976), *cert. denied* 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1977); *cf.* R. Anderson, 1 *American Law of Zoning* 2d § 4.28 (legislative bodies are free to amend plans "without a demonstration that [their] earlier decision was demonstrably wrong or that circumstances have changed...").

ton during the preapplication process. They had no way of knowing what would transpire in the future. For these reasons it is not appropriate to invoke the doctrine of estoppel in this case.

There was no taking of property under the California Constitution, there is no damage remedy for arbitrary zoning assuming arbitrariness could be shown under California law, and estoppel is inappropriate in the instant case. Litton has not demonstrated a factual or legal basis for awarding it damages under state law.

## B. *Writ of Mandate*

As noted above, damages are not a remedy under state law for arbitrary zoning. The issuance of a Writ of Mandate is. Legislative policy in California is clear. Challenges to local government zoning decisions are to be swiftly pursued. Cal.Gov't Code § 65009 (1984). Actions challenging General Plans are to be brought as mandamus proceedings under § 1085 of the Code of Civil Procedure, Cal.Gov't Code § 65751 (1982), and all such proceedings are to be given preference in trial and appellate courts. Cal.Gov't.Code § 65752 (1982).

On June 20, 1983 this court held a hearing on Litton's request for the issuance of a writ of mandate to compel the City to vacate and set aside the August 9, 1982 amendment to the General Plan. Litton's request was denied after this court found that the City's General Plan Amendment was procedurally proper under state statutes and not arbitrary and capricious under state law as stated in *Arnel Development Co. v. City of Costa Mesa*, 126 Cal.App.3d 330, 178 Cal.Rptr. 723 (1981). The decision to deny the request for a writ of mandate is final and not subject to reconsideration at this stage of the litigation. It does, however, seem appropriate to briefly review the reasons for that denial.

 General Plan amendments are legislative acts and can only be set aside if found to be arbitrary or capricious. While the law in some states treats amendments to General Plans as quasi-judicial acts, R. Anderson, 1 *American Law of Zoning 2d*

§ 4.28 *et seq.*, California law does not. Government Code § 65301.5 ("The adoption of the general plan ... or the adoption of any amendment to such plan ... is a legislative act ..."). *Arnel Development Co. v. City of Costa Mesa*, 28 Cal.3d 511, 169 Cal.Rptr. 904, 907, 908, 908 n. 8, 620 P.2d 565; *Cormier v. County of San Luis Obispo*, 161 Cal.App.3d 850, 207 Cal.Rptr. 876 (1984).

The leading California case in which a zoning ordinance was found to be arbitrary is *Arnel Development Co. v. City of Costa Mesa*, 126 Cal.App.3d 330, 178 Cal.Rptr. 723 (1981) (*"Arnel"*). This case was carefully considered by this court in 1983 prior to the hearing on Litton's request for a Writ and in reaching the decision to deny the Writ. In *Arnel* a zoning initiative was set aside as arbitrary. Many factors present in *Arnel* are absent here.

In *Arnel* there was a finding that the city had intensely scrutinized the property to determine the proper zoning. There were more than 18 months of planning and 30 public hearings on the particular piece of property before a decision was made. That carefully considered decision was set aside by a voter initiative. In the instant case, the 1980 designation of the Litton parcel as General Commercial with a Hotel/Motel Node was not carefully considered but was part of a sweeping review of all land use designations in the City. There is evidence that had the 1980 decision been more carefully considered, another land use designation might have been chosen. It is significant that from 1972 to 1980 the parcel was zoned Convenience Commercial. In 1980, despite the residential character of the neighborhood, the decision was made to allow more intensive development on the parcel by giving it a General Commercial designation. Unlike in *Arnel*, the downzoning in the instant case may well have been to correct a hasty, ill-considered earlier decision by the City.

In *Arnel* other zoning alternatives were not considered before a low density residential classification was adopted. In the

instant case three designations—General Commercial, Office Commercial, and Intermediate Density Residential—were considered by the ultimate decision makers, the Council and the Planning Commission.

Finally, there was extensive evidence in *Arnel* showing the need for low and moderate income housing in the region. The initiative would have stopped such development. These facts are not present here.

This court has now twice reviewed GPA–9 to determine whether it was arbitrary—first under the state standard in 1983 and then under the federal standard, *supra*. The validity of Simi Valley's decision to amend the General Plan designation of the Litton parcel is fairly debatable and hence it is not arbitrary or unreasonable and it is constitutional under both state and federal law.

Plaintiff's request for damages is denied. Let judgment be entered accordingly.