**Barbaro FLORES et al.,**
**Plaintiffs-Appellees,**

v.

**Stanley J. PIERCE et al.,**
**Defendants-Appellants.**

No. 77–2903.

United States Court of Appeals,
Ninth Circuit.

May 7, 1980.

Wilbur J. Russ, Russ & Daniels, San Francisco, Cal., for defendants-appellants.

Robert E. Gonzales and Louis F. Flores, San Francisco, Cal., argued for plaintiffs-appellees; Gonzales, Mitchell & Flores, San Francisco, Cal., on the brief.

Before KENNEDY and PREGERSON, Circuit Judges, and BONSAL,* District Judge.

KENNEDY, Circuit Judge:

This civil rights action was commenced in district court by two Mexican-Americans who alleged that officials of the City of Calistoga, California, delayed issuance of a liquor license to them by filing official protests motivated by a purpose to discriminate on the basis of race or national origin. A jury rendered a verdict against the city officials, who now appeal from the judgment against them.

The principal issues here are whether the evidence was sufficient to support a finding that there was a constitutional violation resulting in damage, and whether the trial court erred in failing to instruct the jury that a finding of good faith in filing the protest would be a defense to the action. Our review leads us to conclude that there was sufficient evidence for the jury to decide that the city officials, acting under color of law, did violate the Constitution by filing protests that were motivated in substantial part by the race or national origin of the applicants and that damages were shown. We also conclude that officials who discriminate invidiously are not entitled to good faith immunity in an action under 42 U.S.C. § 1983. We therefore affirm.

The appellees, plaintiffs below, are Barbaro and Alma Flores, husband and wife, both of whom are of Mexican origin. The Floreses were proprietors of a restaurant and bar in Yountville, California, called the Mexicali Rose. The Floreses, by the name of the restaurant and its ambience, including the music, the decorations, and the brands of beer served, sought to attract a Mexican-American clientele, and they were successful in doing so. In July, 1974, the Floreses decided to open a second establishment in Calistoga, a city of 2,200 people, located about twenty miles from Yountville. They leased the premises and made arrangements to open a Mexican restaurant called The Palacio, anticipating that the clientele there also would be comprised in large part of Mexican-Americans. In September, 1974, the Floreses applied for a type 41 liquor license from the Department of Alcoholic Beverage Control of the State of California (ABC), a license which would permit them to serve beer and wine in the restaurant.

Upon learning of the Floreses' license application, the Calistoga police chief, one James Autry, filed a protest with the ABC. The stated grounds for the protest were that granting the license would lead to an undue concentration of licenses in Calistoga and aggravate an existing police problem. Autry and several Calistoga townspeople also brought the Floreses' application to the attention of Mayor Butler and city council members Holtzen, Hively, Thom, and Smith. Acting in their official capacities, Mayor Butler and the city council protested the Floreses' application. About three months later, like protests were also lodged against the application of one Grusdiv, who applied for a liquor license for a pool hall. His clientele consisted almost entirely of Mexican-Americans.

Under California law, a protest by a city operates to block issuance of the license until a hearing is held. See Cal.Bus. & Prof.Code § 24013. After hearings were held on the Flores and Grusdiv applications, the ABC denied both applications. As a result, when the Floreses opened their restaurant on February 6, 1975, they could not serve beer or wine. The Floreses appealed the denial of their application to the Alcoholic Beverage Control Appeals Board. The ABC had at all times conceded that the Floreses had the requisite good moral character to obtain a license. The only question, apparently, was the suitability of the location chosen. The Appeals Board reversed the ABC, and the Floreses' license was finally granted on September 22, 1975.

The Floreses brought suit for damages under 42 U.S.C. § 1983 against the police chief, the mayor, and the city councilmen named above.[1] The case was tried by a jury which returned a general verdict for the Floreses in the amount of $48,500.

It is undisputed on appeal that state action is involved here. The defendants all acted in their official capacities in protesting the application. The Floreses' right under the equal protection clause to be free of state action which purposely discrimi-

---

* Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

1. Certain officials of the ABC were also named in the suit. There was little or no evidence indicating that they acted with a discriminatory intent and they were not found liable.

nates on the basis of race or national origin is also clear. The question is whether the Floreses presented sufficient evidence at trial so that a rational jury could conclude that the defendants violated the Constitution by acting with an intent to discriminate on the basis of race or national origin.

█ The evidence is tested here by the appellants' claim that the trial court erred in denying their motions for judgment notwithstanding the verdict and for a new trial. A directed verdict or judgment notwithstanding the verdict should not be granted unless "the evidence permits only one reasonable conclusion as to the verdict." *Kay v. Cessna Aircraft Co.*, 548 F.2d 1370, 1372 (9th Cir. 1977). The evidence must be viewed in the light most favorable to the prevailing party and all inferences must be drawn in that party's favor. *Id.*; *see also Fountila v. Carter*, 571 F.2d 487, 490 (9th Cir. 1978). In light of these standards, we conclude that there was no basis for directing a verdict for the appellants or setting aside the judgment granted against them.

### Evidence of Intent

█ The impact and effect of law or government action may weigh more adversely on one racial group than another without violating the Constitution. The essence of an equal protection violation on racial grounds lies in the intent or motive to discriminate. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This proposition does not detract, however, from the fundamental rule that disparate racial effect is evidence that may be adduced to prove the invidious intent that is the essence of the violation. Disparate racial impact is of unquestioned relevance in proving the forbidden intent to discriminate. One of the first cases interpreting the equal protection clause stands for the rule, among others, that the effect of a law may be so harsh or adverse in its weight against a particular race that an intent to discriminate is not only a permissible inference but also a necessary one. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In the instant case, the disparate effect of the action on Mexican-Americans was so compelling that the effect may approach, if it does not reach, the demonstration of an intent to discriminate that

was made in *Yick Wo v. Hopkins*. This might be a case where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Arlington Heights, supra*, 429 U.S. at 266, 97 S.Ct. at 564. We need not, however, rely on effect alone, for other evidence suggests a motive or intent to discriminate. It was shown that the defendant city officials deviated from previous procedural patterns, that they adopted an ad hoc method of decision making without reference to fixed standards, that their decision was based in part on reports that referred to explicit racial characteristics, and that they used stereotypic references to individuals from which the trier of fact could infer an intent to disguise a racial animus. In view of these factors and the showing of a disparate effect, it suffices for us to conclude, as we do, that the evidence, in its entirety was sufficient to support the judgment. *See id.* at 267–68, 97 S.Ct. at 564–65.

We begin by discussing the evidence of the disparate and adverse impact on Mexican-Americans resulting from the actions of the city officials. In a seven-month period between May and December, 1974, there were five liquor license applications for premises in Calistoga. Three of the applications were by persons who were not Mexican-American for premises that would primarily serve a clientele that was not Mexican-American. No city protests were filed against these applications. Of the remaining two, one was by the Floreses and the other by Grusdiv, whose clientele was 98% Mexican-American. Both of these applications were protested. The licenses that were granted without protests were for premises in the same neighborhood in which the Floreses and Grusdiv sought to do business. The two licenses that were protested were for beer and wine only, while the three licenses that were not protested were in one case for beer and wine, and in other cases for service of stronger alcoholic beverages. There is thus no possibility that the protests in the instant case can be explained on the grounds of undue concentration or the purpose to promote temperance. The premises leased by the Floreses in Calistoga had been licensed for alcoholic beverage sales to the previous occupant for 34 years, and the city had never objected to that use.

The pattern of selective protests undercuts the appellants' claim that they acted to prevent an undue concentration of licenses

in Calistoga. Indeed, it appears that the defendants were provided with this technical justification by counsel after they had made the decision to protest. Police chief Autry was specifically informed by the ABC that he could not, in the ABC's words, "pick and choose" the applications he would protest and that to do so would be to discriminate. He continued, nevertheless, the policy of selective protests affecting the Mexican-American establishments in question.

The selective protests also belie the contention that the defendants acted to prevent aggravation of an existing police problem. There is simply no support in the evidence that there was a police problem in Calistoga, or that the presence of the Floreses and their clientele would lead to increased crime there. The county sheriff having jurisdiction over the Floreses' establishment in Yountville testified that the premises were not a police problem and that the Floreses consistently cooperated with his department and with the Yountville police. The ABC specifically found the Floreses to be of good moral character. Selective protests and disparate impact on the Floreses create substantial grounds for inference of discriminatory intent.

The record makes clear that the appellants were aware that the Floreses and Grusdiv had a clientele that was almost exclusively Mexican-American. The adverse impact of the officials' action was, almost by definition in this case, a foreseeable consequence of the selective protest policy. The Supreme Court has stated as follows in this regard:

> [A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose. Those cases do not forbid "the foreseeable effects standard from being utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn." Adherence to a particular policy or practice, "with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn."

*Columbus Bd. of Education v. Penick,* 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed. 2d 666 (1979) (citations omitted).

There were also significant departures from prior procedural sequences here which point toward discriminatory intent. The Calistoga city council had never issued protests against liquor license applications in Calistoga before the case in question. Chief Autry had never protested an application before the Floreses' case arose. No application by an owner who was not Mexican-American for an establishment that would cater to persons who were not Mexican-Americans was protested either before or after the incident in question. The city council rejected a proposal for a uniform protest policy and insisted upon an ad hoc approach.

There is also evidence that the defendants acted with reference to racial classifications and offered explanations which invoked stereotypes from which one could infer an intent to adopt a racial classification. Autry specifically justified his protests by reliance on reports from sheriff's officers and police officials in Yountville who in earlier ABC investigations had stated that police problems had been aggravated "by the large number of Mexican field workers in the area to harvest the grapes." Autry also relied on police reports that specifically identified both participants and witnesses in various incidents as being of Mexican origin. The council passed a resolution instructing the police chief to bring applications for new liquor licenses to the council so that it could determine "the desirability of the applicant" and protest accordingly. Councilman Holtzen, one of the defendants, in response to questioning regarding the term "desirability," stated that Calistoga was "a fine little town," and that it was necessary to keep the town on a "good level." Against the background recited above, the jury may well have concluded, in view of the selective protests and the Mexican background of the Floreses and of the Grusdiv clientele, that the explanations given by the defendants for their actions were simply pretexts to conceal an intent to act upon stereotypic classifications which resulted from a racial animus.

The evidence here was more than sufficient to support a finding that the appellants acted with the purpose and intent of discriminating on the basis of race or national origin.

## Causation

Appellants claim that the protest by city officials did not injure the Floreses

since the ultimate decision to approve the license rests with the ABC and the state agency found the protests meritorious after the first hearing. We disagree. The violation here consisted not in the ABC's initial denial of the license, but in the policy of the city officials to force the applicants to undertake extraordinary measures for its issuance. If the rigors of the governmental or administrative process are imposed upon certain persons with an intent to burden, hinder, or punish them by reason of their race or national origin, then this imposition constitutes a denial of equal protection, notwithstanding the right of the affected persons to secure the benefits they seek by pursuing further legal procedures. *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *see also Reitman v. Mulkey*, 387. U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

The evidence establishes that the defendants' protests were intended to, and did, cause the ABC to delay issuance of the license. Protests made by public officials or by the governing body of a city or county stand on a different footing from the protests of private citizens. The ABC may reject protests of private citizens and issue a license without holding a hearing if it determines that the protests are "false, vexatious, or without reasonable or probable cause . . . ." Cal.Bus. & Prof.Code § 24013. If, however, a protest is made by public officials or by the governing body of the city or county, then the ABC may not issue a license until after it holds a hearing. *Id.* There was testimony, moreover, that it is an ABC policy to sustain an official protest if there is any color of merit to it, at least in the first instance. The ABC regional director testified that if the city officials here had not protested, he would have recommended initial issuance of the license. There was sufficient evidence in the record to infer causation and damage without this testimony, but its addition to the evidence all but compels a finding for the appellees on these issues. The argument that causation was not shown is therefore rejected.

## Qualified Immunity

The Supreme Court, and this court, have specifically left open the question whether individuals performing legislative functions on the purely local level are entitled to the absolute legislative immunity of *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). *See Lake County Es-* *tates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 405 n.26, 99 S.Ct. 1171, 1179 n.26, 59 L.Ed.2d 401 (1979); *Morrison v. Jones*, 607 F.2d 1269, 1274 (9th Cir. 1979) (per curiam), *cert. denied,* ── U.S. ────, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). This question is not presented for our review in this case. The defendant city councilmen did not ask for an instruction regarding absolute immunity in the trial court; they only asked that the jury be instructed on the defense of qualified immunity. On this appeal, moreover, appellants do not raise the question of absolute legislative immunity and even appear to concede that they are entitled to no more than qualified immunity. We do not, therefore, address the question previously left open, and we confine our review on this aspect of the case to appellants' contention that it was error to refuse an instruction based on immunity for actions taken in good faith.

The district court refused to instruct the jury that the defendants were entitled to immunity if they acted in good faith in protesting the Floreses' application. The district court was correct, for on this record there was no basis to support a finding of good faith. Appellants' reliance on *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), to support their argument that they were entitled to an instruction regarding qualified immunity is wholly misplaced. In *Wood* the Supreme Court ruled that a state official is not immune from liability for damages under section 1983

> if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

420 U.S. at 322, 95 S.Ct. at 1001.

There are objective and subjective aspects to the defense of good faith immunity. *See Morrison v. Jones, supra,* 607 F.2d at 1274; *Johnson v. Duffy*, 588 F.2d 740, 745 (9th Cir. 1978); *Walker v. Hoffman*, 583 F.2d 1073 (9th Cir. 1978) (per curiam), *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). There is no objective basis for the defense if it is not reasonable to believe that there was a lawful right to take the action in question. In

this respect state officials are liable under section 1983

if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm.

*Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978). As to the subjective aspect of the defense, an official forfeits immunity if, whatever the objective state of the law at the time of his action, his own intent was to harm the plaintiff for a reason prohibited by the Constitution. *McNamara v. Moody*, 606 F.2d 621, 625 (5th Cir. 1979).

 The objective test is not satisfied here because these appellants had no reasonable grounds to believe that they could file a protest against the Floreses' application because of the Floreses' national origin. No official can in good faith impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them. The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it. *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). We hold, moreover, that once a defendant is shown to have acted with intent to discriminate based on racial or ethnic hostility, such intent constitutes the malicious intention to cause a deprivation of constitutional rights that is inconsistent with the subjective state of mind required for the defense of good faith immunity.

In view of this analysis, it was not necessary to instruct the jury as to qualified immunity. If the jury found that the defendants acted with the proscribed discriminatory intent, the defendants would not have been entitled to immunity; if, however, discriminatory intent were not proved, then there would be no violation of the equal protection clause, no cause of action under section 1983, and no need for immunity to protect an official from liability for damages. Under the first possibility immunity is not present and under the second it would not be needed. Defendants' contention that the failure to instruct the jury regarding a defense of qualified immunity was error is therefore without merit.

### Damages

 Appellants claim that the award of $48,500 in damages was excessive as a matter of law and that the district court erred in denying a motion for a new trial on this ground. We hold the verdicts are supported by the evidence and within permissible limits.

 We will not disturb an award of damages on appeal unless it is clear that the evidence does not support it. *Fountila v. Carter, supra*, 571 F.2d at 492; *Peacock v. Board of Regents*, 597 F.2d 163, 165 (9th Cir. 1979); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976). In *Donovan v. Reinbold*, 433 F.2d 738, 743 (9th Cir. 1970), we stated:

Compensatory damages awardable in a Civil Rights Act case are not limited to the out-of-pocket pecuniary loss the complainant suffered. Damages can also be awarded for emotional and mental distress caused by the intentional tort.

*See also Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The evidence submitted showed that the Floreses lost profits during the period they were without a liquor license, that they incurred additional attorneys' fees because of the official protests, and that they suffered emotional distress from the selective protests and the denial of their application. These factors were entirely sufficient to sustain the damage award.

The other contentions of appellants are without merit. The judgment of the district court is AFFIRMED.