CLEVELAND CONSTRUCTION, INC., Appellant and Cross–Appellee,

v.

CITY OF CINCINNATI, Appellee and Cross–Appellant;

Riordan et al., Appellees.

[Cite as *Cleveland Constr., Inc. v. Cincinnati*, 169 Ohio App.3d 627, 2006-Ohio-6452.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–050749, C–050779 and C–050888.

Decided Dec. 8, 2006.

628

630

Manley Burke L.P.A., W. Kelly Lundrigan, Gary E. Powell, and Robert E. Manley, for appellant and cross-appellee.

Julia L. McNeil, Cincinnati City Solicitor, and Julie F. Bissinger, Assistant City Solicitor, for appellee and cross-appellant, city of Cincinnati, and for appellees Timothy Riordan, Bernardine Franklin, Nate Mullaney, Alicia Townsend, and Kathi Ranford.

Cors & Bassett, L.L.C., David L. Barth, and Kelly A. Armstrong, for appellee Valley Interior Systems, Inc.

---

SYLVIA SIEVE HENDON, Judge.

{¶ 1} This case arose from the city of Cincinnati's rejection of a bid by Cleveland Construction Company for drywall work on the expansion and renovation of the Cincinnati Convention Center. At the heart of the dispute was the city's implementation of its small business enterprise ("SBE") program.

{¶ 2} Cincinnati Municipal Code ("CMC") 321–37 required the city to award a construction contract to the lowest and best bidder. The ordinance set forth a nonexhaustive list of factors that the city purchasing agent could consider in determining the lowest and best bid. One of the factors that could be considered was a contractor's compliance with the rules and regulations of the city's SBE Subcontracting Outreach Program.[1]

{¶ 3} Where a lowest-and-best determination was based primarily on the contractor's subcontracting-outreach compliance, the ordinance had a built-in cap. The contract award could be made "subject to the following limitation: the bid could not exceed an otherwise qualified bid by ten (10%) percent or Fifty Thousand Dollars ($50,000.00), whichever is lower."[2] The cap was apparently intended to strike a balance between the city's efforts to include small businesses in public contracts and the city's interest in protecting its taxpayers from excessive costs.

{¶ 4} On December 23, 2003, the city issued an invitation to bid on the Cincinnati Convention Center Expansion and Renovation Project, entitled "Bid Package C / TC—09A Drywall." The city required bidders to show that they had made a good-faith effort to obtain the participation of SBEs on the project. For the drywall-contract bids, the city established a mandatory SBE-participation goal of 35 percent. Bidders were notified that their failure to meet the SBE-

---

1. CMC 321–37(c)(4).

2. CMC 321–37(c).

participation goal could cause a bid to be rejected as nonresponsive. The city received bids until February 5, 2004.

{¶ 5} On February 11, 2004, Kathi Ranford, a contract-compliance officer, reported to Bernadine Franklin, the city's purchasing agent, that none of the three bidders for the project's drywall contract had complied with the 35 percent SBE-participation requirement. According to Ranford, Cleveland had submitted a bid with three percent SBE participation, Valley Interior Systems had submitted a bid with 34 percent SBE participation, and Kite, Inc., had submitted a bid with no SBE participation. In that round of bidding, Cleveland's bid had been the lowest dollar bid.

{¶ 6} Because none of the bidders had achieved the full 35 percent SBE-participation goal, the city conducted an emergency rebidding for the drywall contract. On February 24, 2004, Ranford notified Franklin that Cleveland had submitted a rebid for $8,889,000, with ten percent SBE participation and that Valley had submitted a rebid for $10,135,022, with 40 percent SBE participation.

{¶ 7} The city's office of contract compliance deemed Cleveland's bid to be unacceptable due to its failure to achieve 35 percent SBE participation. In all other respects, however, Cleveland's bid had been found acceptable according to the city's purchasing division.

{¶ 8} Following a review of the acceptability of the bids, Franklin issued a recommendation to Timothy Riordan, an assistant city manager, that the drywall contract be awarded to Valley. Franklin's recommendation stated, "Pursuant to Section 321–37 of the Municipal Code, the bid submitted by [Valley] has been determined to be the lowest and best bid."

{¶ 9} Valley's new bid exceeded Cleveland's new bid by $1,246,022, well over the $50,000 or ten percent cap in CMC 321–37. Nonetheless, on March 3, 2004, the city awarded the drywall contract to Valley and instructed Valley to commence work under the terms of the contract.

### Cleveland Files Suit

{¶ 10} Three weeks later, on March 30, 2004, Cleveland brought an action for injunctive relief and damages against the city, several city employees, and Valley. Cleveland asked the court to restrain the city and Valley from proceeding on the drywall contract and to order the city to award the contract to Cleveland.

{¶ 11} In addition, Cleveland sought declarations by the court that (1) the city's award of the contract violated CMC 321–37; (2) the city's drywall contract with Valley was void; (3) the city's SBE program was unconstitutional and in violation of Section 1983, Title 42, U.S.Code; (4) the city had deprived Cleveland of a property interest; (5) Cleveland was the lowest and best bidder; and (6) the

city's delegation of discretion to its purchasing agent under the SBE subcontracting-outreach program was void.

{¶ 12} Finally, Cleveland sought compensatory and punitive damages, as well as attorney fees and costs.

{¶ 13} The trial court denied Cleveland's motion for a temporary restraining order. Later, upon motion, the trial court dismissed the city employees from the action.

{¶ 14} In June 2005, the case proceeded to a jury trial. At the close of Cleveland's case, the trial court directed a verdict in favor of the city and Valley on Cleveland's claims for lost profits. Cleveland's remaining claims for injunctive and declaratory relief and attorney fees were tried to the bench by agreement of the parties.

{¶ 15} At the conclusion of the trial, the court found that the city had violated CMC 321–37 by awarding the drywall contract to Valley rather than to Cleveland. As a result, the court held, the city had abused its discretion in a manner that had denied Cleveland the contract in violation of its federally protected due-process rights and in violation of Section 1983.

{¶ 16} The court held that the city's SBE program rules and guidelines created race- and gender-based classifications that rendered the program facially unconstitutional. The court further found that the city had pressured and encouraged bidders, including Cleveland, to draw upon race- and gender-based classifications, in violation of Cleveland's rights under Section 1983. But the court held that Cleveland had failed to establish that the denial of the drywall contract was the result of the race- and gender-based classifications; rather, it held that the denial had been the result of the city's preference for small businesses.

{¶ 17} The court rendered a declaratory judgment that precludes the city from awarding future contracts to a bidder that exceeds the cap set forth in CMC 321–37 if the bid selection is based primarily on the bidders' compliance with the SBE subcontracting-outreach program.

{¶ 18} The court permanently enjoined the city from maintaining or applying race- or gender-based classifications in its SBE rules and guidelines, absent a formal determination that such race-based provisions were narrowly tailored and necessary to fulfill compelling governmental interests, or that such gender-based provisions were substantially related to genuine and important governmental objectives.

{¶ 19} Finally, the court entered judgment in favor of Cleveland as the prevailing party, and against the city, for Cleveland's reasonable attorney fees and costs pursuant to Section 1988, Title 42, U.S.Code. The court also entered judgment in favor of Valley.

{¶ 20} On appeal, Cleveland argues that the trial court erred by (1) directing a verdict in favor of the city on Cleveland's damage claims; (2) refusing to declare Valley's drywall contract to be void or to prohibit performance under the contract; (3) ruling that Cleveland could not elicit testimony from Valley's subcontractors with respect to postcontract events; (4) denying Cleveland's motion for a new trial; (5) granting the motions to dismiss individual city employees; and (6) making findings concerning causation of damages.

{¶ 21} In its cross-appeal, the city argues that the trial court (1) erred by applying CMC 321–37; (2) lacked jurisdiction over Cleveland's claims for injunctive relief; (3) erred by concluding that the city had deprived Cleveland of its right to procedural due process; (4) erred by ruling that portions of the city's SBE program created constitutionally impermissible race- and gender-based classifications; and (5) erred by awarding attorney fees to Cleveland. We first address the city's assignments of error.

## The Application of CMC 321–37

{¶ 22} In its first assignment of error, the city argues that the trial court erred by applying CMC 321–37 in its analysis of Cleveland's claims. The city contends that Franklin had not applied the provisions of CMC 321–37 in her review of bids for the project because the ordinance had not been in place at the time the project's "procurement process" was planned.

{¶ 23} The record reflects that CMC 321–37 had been adopted in specific contemplation of the convention-center project. By its terms, the ordinance had been enacted as an emergency measure due to the city's "immediate need to proceed with the bidding of the Convention Center and major development projects." The ordinance specifically applied to the award of construction contracts that exceeded $100,000. And the ordinance had gone into effect before the project's bid solicitation and well before the award of the drywall contract. So Franklin's selection of the lowest and best bidder was subject to CMC 321–37.

{¶ 24} The city argues that "[e]ven though Valley's bid was $1.2 million more than Cleveland's, the project was well within the budget." This argument fails to take into account that "among the purposes of competitive bidding legislation are the protection of the taxpayer [and the] prevention of excessive costs."[3] The fact that the project was under budget was of questionable relevance and was certainly not dispositive of the legality of the bid-selection process.

{¶ 25} The city argues that even if Franklin had applied CMC 321–37 to the drywall-contract bids, the ordinance's cap would not have come into play because

---

3. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgmt. Dist.* (1995), 73 Ohio St.3d 590, 602, 653 N.E.2d 646.

Cleveland's bid was not an "otherwise qualified" bid. But the city acknowledges in its brief that "[t]he trial evidence established that Cleveland lost because its drywall bid failed to reserve at least 35% of the work for small business enterprises as the bid documents required." In other words, but for its SBE noncompliance, Cleveland's bid was qualified. Where the sole reason that Cleveland's bid was rejected was its noncompliance with the SBE subcontracting-outreach program, Cleveland was an "otherwise qualified" bidder. Under these circumstances, Valley's SBE-compliant bid could not have exceeded Cleveland's bid by the $50,000 or ten percent cap.

{¶ 26} Accordingly, we hold that the trial court properly considered and applied CMC 321–37. We overrule the city's first assignment of error.

### Cleveland's Standing

{¶ 27} In its second assignment of error, the city argues that the trial court lacked jurisdiction over Cleveland's claims for injunctive relief. The city contends that the possibility that Cleveland might bid on a city contract in the future did not create a risk that it would again be subject to a deprivation of rights.

{¶ 28} In Ohio, it is well established that standing to challenge the constitutionality of a legislative enactment exists when a litigant "has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general, that the law in question has caused the injury, and that the relief requested will redress the injury." [4]

{¶ 29} In the context of a constitutional challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, and not necessarily the loss of a contract. So to establish standing, a party challenging a set-aside program need demonstrate only that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis. [5]

{¶ 30} At trial, the city specifically stipulated that Cleveland intended and was able to bid on future city construction projects. And the city's discriminatory policies would have affected Cleveland's ability to compete fairly. So Cleveland had sufficient standing to seek injunctive relief against the city. We overrule the city's second assignment of error.

---

4. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 469–470, 715 N.E.2d 1062.

5. *Northeastern Fla. Chapter of Associated Gen. Contrs. of Am. v. Jacksonville* (1993), 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586.

### Deprivation of a Property Interest

{¶ 31} In its third assignment of error, the city argues that the trial court erred by concluding that the city had deprived Cleveland of a right to procedural due process.

{¶ 32} One of the proscriptions of the Fourteenth Amendment is the deprivation of a person's property interests without due process of law.[6] In a due-process challenge based upon such a deprivation, we must first determine whether a protected property interest was at stake.

{¶ 33} Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."[7] A person has a property interest in a benefit, such as a public contract, if the person has a legitimate claim of entitlement to it.[8] A person's unilateral expectation of a benefit is not enough.[9]

{¶ 34} The Sixth Circuit Court of Appeals has held that a disappointed bidder may establish a legitimate claim of entitlement to a public contract in one of two ways. A bidder can show either that it actually was awarded the contract and was then deprived of it, or that the government abused its limited discretion in awarding the contract to another bidder.[10]

{¶ 35} Generally, municipalities are vested with broad discretion in matters related to public contracts. But that discretion is not limitless.[11] For example, a municipality "may by its actions commit itself to follow rules it has itself established."[12]

{¶ 36} In the context of lowest-and-best-bidder determinations, Ohio courts are reluctant to substitute their judgment for that of city officials.[13] But

6. *Bd. of Regents v. Roth* (1972), 408 U.S. 564, 569–570, 92 S.Ct. 2701, 33 L.Ed.2d 548.

7. Id. at 577, 92 S.Ct. 2701, 33 L.Ed.2d 548.

8. *Cleveland Constr. v. Ohio Dept. of Admin. Servs., GSA* (1997), 121 Ohio App.3d 372, 394, 700 N.E.2d 54.

9. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701, 33 L.Ed.2d 548.

10. *United of Omaha Life Ins. Co. v. Solomon* (C.A.6, 1992), 960 F.2d 31, 34; *Enertech Elec. v. Mahoning Cty. Commrs.* (C.A.6, 1996), 85 F.3d 257, 260.

11. *Danis*, 73 Ohio St.3d at 604, 653 N.E.2d 646.

12. Id. at 603, 653 N.E.2d 646.

13. See *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 552 N.E.2d 202.

when city officials abuse the discretion vested in them, courts will intervene.[14] An abuse of discretion "connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary, or unconscionable attitude. * * * 'Arbitrary' means 'without adequate determining principle; * * * *not governed by any fixed rules or standard.'* * * * 'Unreasonable' means 'irrational.' " [15]

{¶ 37} In this case, the city had established a "fixed rule" with respect to the award of a contract based primarily upon the bidder's subcontracting-outreach-program compliance. In that instance, CMC 321–37 required the city to apply the ordinance's cap.

{¶ 38} But here, the evidence demonstrated that the city had arbitrarily ignored the cap in awarding the contract to Valley. Thus, we agree with the trial court that the city's failure to follow the directive of its own ordinance constituted an abuse of discretion that resulted in a deprivation of Cleveland's property interest in the contract award. We overrule the city's third assignment of error.

### SBE Program Provisions Were Facially Unconstitutional

 {¶ 39} In its fourth assignment of error, the city argues that the trial court erred by ruling that elements of the rules and guidelines in the city's SBE program created constitutionally impermissible race- and gender-based classifications. The city contends that the program was a lawful "outreach" program that encouraged contractors to use "good faith efforts" to promote opportunities for minorities and females.

 {¶ 40} The Fourteenth Amendment requires strict scrutiny of all race-based action by state and local governments.[16] Racial classifications must serve a compelling government interest and must be narrowly tailored to further that interest.[17] Gender-based classifications, by contrast, require an "exceedingly persuasive" justification.[18]

{¶ 41} At trial, the city did not put forth any argument or evidence to demonstrate that its SBE program could withstand such heightened scrutiny. Instead, the city relied on its assertion that increased scrutiny should not apply in

---

14. Id. at 21–22, 552 N.E.2d 202.

15. (Emphasis added.) *Dayton ex rel. Scandrick v. McGee* (1981), 67 Ohio St.2d 356, 359, 21 O.O.3d 225, 423 N.E.2d 1095

16. *Richmond v. J.A. Croson Co.* (1989), 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854.

17. *Adarand Constructors v. Pena* (1995), 515 U.S. 200, 235, 115 S.Ct. 2097, 132 L.Ed.2d 158.

18. *United States v. Virginia* (1996), 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735.

the first instance because its SBE program created neither race- nor gender-based classifications.

{¶ 42} On appeal, the city acknowledges that it had predetermined estimates of the availability of minorities and females for each trade represented in the convention center project. But the city argues that its availability estimates were for informational purposes only and that bidders were required to do nothing in response.

{¶ 43} Racial or gender classifications may arise from a regulation's strict requirements, such as mandated quotas or set-asides. But rigid mandates are not a prerequisite to a finding of a racial classification.[19] When regulations pressure or encourage contractors to hire minority subcontractors, courts must apply strict scrutiny.[20]

{¶ 44} For example, in *Adarand Constructors v. Pena*,[21] the United States Supreme Court considered federal regulations that provided financial incentives to bidding contractors to hire minority subcontractors. The regulations did not require contractors to use minority subcontractors. But contractors would receive additional compensation if they did so. The court held that to the extent that the regulations provided incentives to contractors to use race-based classifications, the regulations were subject to strict scrutiny.[22]

{¶ 45} In determining whether strict scrutiny must be applied to the city's SBE program, we must look behind its ostensibly neutral labels such as "outreach program" and "participation goals." The program's rules and guidelines "are not immunized from scrutiny because they purport to establish 'goals' rather than 'quotas.' [Courts] look to the economic realities of the program rather than the label attached to it."[23]

{¶ 46} Under the city's SBE rules and guidelines, all bidders were required to use "good faith efforts" to promote opportunities for minority- and women-owned businesses ("MBEs" and "WBEs") to the extent of their availability as determined by the city. With respect to the drywall portion of the project, the city

---

19. *Bras v. Calif. Pub. Utils. Comm.* (C.A.9, 1995), 59 F.3d 869.

20. See *Lutheran Church–Missouri Synod v. Fed. Communications Comm.* (C.A.D.C.1998), 154 F.3d 487; *Monterey Mechanical Co. v. Wilson* (C.A.9, 1997), 125 F.3d 702; *Safeco Ins. Co. of Am. v. White House* (C.A.6, 1999), 191 F.3d 675.

21. 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158.

22. Id. at 224, 115 S.Ct. 2097, 132 L.Ed.2d 158.

23. *Bras*, 59 F.3d at 874.

estimated that the availability of MBEs was 13.09 percent, and that it was 1.05 percent for WBEs.

{¶ 47} Bidders were required to provide detailed descriptions of the techniques used to obtain participation of MBEs and WBEs. The city would then evaluate each bidder's documented efforts to achieve participation of MBEs and WBEs. If that review determined that a bid's utilization percentage for MBEs and WBEs was lower than the estimated availability for those groups, the bid would be flagged for a discrimination investigation.

{¶ 48} Where the city's SBE program required documentation of a bidder's specific efforts to achieve the participation of minority subcontractors to the extent of their availability as predetermined by the city, the program undeniably pressured bidders to implement racial preferences.[24] Therefore, the program's rules must be subject to strict scrutiny. To the extent that the rules pressured bidders to hire women-owned subcontractors, the city was required to demonstrate an "exceedingly persuasive" justification for the differential treatment.

{¶ 49} Given that the city effectively conceded that it could not justify race- or gender-based classifications under either standard of heightened scrutiny, the trial court properly determined that those elements of the program that caused bidders to use racial- or gender-based preferences were unconstitutionally impermissible.

### Award of Attorney Fees

{¶ 50} In its fifth assignment of error, the city argues that the trial court erred by awarding attorney fees to Cleveland. The city contends that Cleveland was not entitled to the award because it was not a prevailing party.

{¶ 51} A "prevailing party" is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."[25] To be a "prevailing party," there must have been "a court-ordered 'change [in] the legal relationship'" between the parties.[26] In this regard, a declaratory judgment may serve as the basis for an award of attorney fees.[27]

---

**24.** *Safeco Ins.*, 191 F.3d at 692, citing *Lutheran*, 154 F.3d at 491.

**25.** *Hensley v. Eckerhart* (1983), 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40.

**26.** *Buckhannon Bd. v. W. Va. Dept. of Health & Human Resources* (2001), 532 U.S. 598, 604, 121 S.Ct. 1835, 149 L.Ed.2d 855.

**27.** *Hewitt v. Helms* (1987), 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654.

{¶ 52} But the entry of a declaratory judgment in a party's favor does not automatically render that party a prevailing party under Section 1988.[28] "In all civil litigation, the judicial decree is not the end but the means. At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces—the payment of damages, or some specific performance, or the termination of some conduct. Redress is sought *through* the court, but *from* the defendant. This is no less true of a declaratory judgment suit than of any other action. The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" (Emphasis sic.) [29]

{¶ 53} We hold that the trial court did not abuse its discretion in ordering attorney fees. Cleveland successfully challenged the unconstitutional race- and gender-based provisions of the city's SBE program. As a result, the city will no longer be permitted to apply those provisions against Cleveland or other bidders on city contracts. In that regard, Cleveland was a prevailing party because the judgment had a distinct effect on the city's behavior. Accordingly, we overrule the city's fifth assignment of error.

### Directed Verdict

{¶ 54} In its complaint, Cleveland sought damages for the loss of profits that it would have realized had it been awarded the drywall contract. Cleveland now argues in its first assignment of error that the trial court erred by directing a verdict in favor of the city on its lost-profits claim.

{¶ 55} In considering a motion for a directed verdict, a trial court must construe the evidence most strongly in favor of the party against whom the motion is made.[30] In doing so, if the court "finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." [31]

{¶ 56} "A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." [32] Because a question of law is presented, we apply a

---

28. *Rhodes v. Stewart* (1988), 488 U.S. 1, 109 S.Ct. 202, 102 L.Ed.2d 1.

29. *Hewitt,* 482 U.S. at 761, 107 S.Ct. 2672, 96 L.Ed.2d 654.

30. Civ.R. 50(A)(4).

31. Civ.R. 50(A)(4).

32. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4, quoting *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph three of the syllabus.

de novo standard of review to a directed verdict.[33]

{¶ 57} Cleveland acknowledges that the Ohio Supreme Court's recent decision in *Cementech v. Fairlawn* [34] resolves its claim for damages under state law. In *Cementech*, the court held that when a municipality violates competitive-bidding laws in awarding a competitively bid project, a disappointed bidder cannot recover its lost profits as damages.

{¶ 58} But in addition to its claim for damages under state law, Cleveland sought damages under federal law, Section 1983, Title 42, U.S.Code, for the city's deprivation of its property interest in the drywall contract. Under Section 1983, a party that has been deprived of a federal right under the color of state law may seek relief through "an action at law, suit in equity, or other proper proceeding for redress."

{¶ 59} The basic purpose of a Section 1983 damage award is to compensate persons for injuries caused by the deprivation of constitutional rights.[35] For this reason, no compensatory damages may be awarded in a Section 1983 suit without proof of actual injury.[36] The level of a person's compensatory damages under Section 1983 is ordinarily determined according to principles derived from the common law of torts.[37]

{¶ 60} In *Adarand Constructors v. Pena*,[38] the United States Supreme Court considered whether a rejected bidder had standing to seek injunctive relief against future application of a minority set-aside program. In doing so, the court presumed that the rejected bidder was entitled to seek damages for the lost contract:

{¶ 61} "Adarand, in addition to its general prayer for 'such other and further relief as to the Court seems just and equitable,' specifically seeks declaratory and injunctive relief against any *future* use of subcontractor compensation clauses. * * * Before reaching the merits of Adarand's challenge, we must consider whether Adarand has standing to seek forward-looking relief. Adarand's allega-

---

33. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 521, 523, 668 N.E.2d 889.

34. 109 Ohio St.3d 475, 2006-Ohio-2991, 849 N.E.2d 24.

35. *Carey v. Piphus* (1978), 435 U.S. 247, 253–254, 98 S.Ct. 1042, 55 L.Ed.2d 252.

36. *Memphis Community School Dist. v. Stachura* (1986), 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249.

37. Id. at 306–307, 106 S.Ct. 2537, 91 L.Ed.2d 249.

38. 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158.

tion that it has lost a contract in the past because of a subcontractor compensation clause *of course entitles it to seek damages for the loss of that contract* [.]" (Emphasis added.)

{¶ 62} Those damages may include a disappointed bidder's lost profits.[39] In *W.H. Scott Constr. Co., Inc. v. Jackson,*[40] the Fifth Circuit Court of Appeals considered an equal-protection challenge to a policy encouraging minority participation in city construction projects. The court upheld an award of lost profits to a rejected bidder who had sought damages from the city under Section 1983.

{¶ 63} Similarly, in *Hershell Gill Consulting Engineers, Inc. v. Miami–Dade Cty., Fla.,*[41] the court held that a county was liable to the plaintiffs under Section 1983 for any compensatory damages resulting from its unconstitutional affirmative-action programs. The court held that the plaintiffs' damages could include their lost profits, but that the plaintiffs in that case had failed to prove that any actual losses had resulted from the unconstitutional programs.[42]

{¶ 64} In this case, the trial court concluded that Cleveland's failure to adduce evidence concerning the degree of completion of the drywall contract precluded Cleveland from proceeding on its claim for money damages. The court reasoned that Cleveland's damages were speculative, not due to a failure of proof as to Cleveland's anticipated profits, but due to the court's misapprehension that Cleveland's damage claim was wholly dependent on its claim for injunctive relief.

{¶ 65} Certainly, the status of the drywall project would have been relevant to a determination of any injunctive relief the court may have awarded, but that evidence was not critical to Cleveland's claim for Section 1983 damages. In effect, the trial court's entry of a directed verdict on the damage claim precluded Cleveland from seeking redress, even though Cleveland could have waited to file suit until the drywall contract had been completed. The issuance of a directed verdict on the issue of Section 1983 damages before the contract's completion had the absurd result of denying redress because of Cleveland's diligence in asserting its claims.

{¶ 66} We recognize that a plaintiff seeking redress under Section 1983 is required to mitigate its damages.[43] But once the plaintiff has presented

---

39. See *Flores v. Pierce* (C.A.9, 1980), 617 F.2d 1386, 1392; *Chalmers v. Los Angeles* (C.A.9, 1985), 762 F.2d 753.

40. (C.A.5, 1999), 199 F.3d 206.

41. (S.D.Fla.2004), 333 F.Supp.2d 1305.

42. Id. at 1339.

43. *Meyers v. Cincinnati* (C.A.6, 1994), 14 F.3d 1115, 1119.

evidence of damages, the defendant has the burden of establishing the plaintiff's failure to properly mitigate damages.[44] So once Cleveland presented evidence of damages, the burden of proof on the issue of mitigation was on the city.

{¶ 67} Because a jury could have concluded that Cleveland had established all the elements of its Section 1983 claim for damages, we hold that a directed verdict in favor of the city was unwarranted. Consequently, we sustain Cleveland's first assignment of error in part, reverse the entry of the directed verdict on the Section 1983 damage claim, and remand the cause for a new trial on the issues of liability and damages with respect to Cleveland's lost-profits claim under Section 1983.

{¶ 68} Because Cleveland's fourth and sixth assignments of error relate to the trial court's dismissal of its damage claims, we address the assignments out of order. Cleveland argues that the trial court erred by denying its motion for a new trial, given the court's erroneous dismissal of its damage claim under Section 1983. Cleveland also contends that the trial court erred by making "a finding that, essentially, amount[ed] to a directed verdict on the issue of proximate causation of Cleveland's damages in addition to that given at trial." For the reasons set forth in our disposition of Cleveland's first assignment of error, we sustain the fourth and sixth assignments of error.

### The Denial of Injunctive Relief

{¶ 69} In its second assignment of error, Cleveland argues that the trial court erred by refusing to declare the drywall contract unenforceable and by failing to enjoin performance of the contract. Cleveland contends that the trial court should have enjoined performance of the contract despite the fact that substantial work had been completed on the project.

{¶ 70} An appellate court need not consider an issue when the court becomes aware of an intervening event that has rendered the issue moot.[45] The duty of an appellate court is to decide actual controversies between parties and to render judgments that may be carried into effect.[46] "Thus, when circumstances prevent an appellate court from granting relief in a case, the mootness doctrine precludes consideration of those issues."[47] For example, in the context of appeals involving construction projects, Ohio courts have held that an appeal is

---

44. Id., citing *Rasimas v. Michigan Dept. of Mental Health* (C.A.6, 1983), 714 F.2d 614.

45. *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, at ¶ 15, citing *Miner v. Witt* (1910), 82 Ohio St. 237, 238, 92 N.E. 21.

46. *Miner*, 82 Ohio St. at 238, 92 N.E. 21.

47. *Schwab v. Lattimore*, 166 Ohio App.3d 12, 2006-Ohio-1372, 848 N.E.2d 912, at ¶ 10.

rendered moot where the appellant fails to obtain a stay of execution of the trial court's judgment and construction commences.[48]

{¶ 71} In this case, there is no dispute that the convention center project, which was substantially completed at the time that the trial court denied the injunction, is now completed in its entirety. At no point in the proceedings did Cleveland obtain a stay of the trial court's denial of its request for a temporary restraining order. In fact, as the trial court pointed out, Cleveland did not pursue preliminary injunctive relief for an entire year. Instead, Cleveland acceded to several continuances. In denying Cleveland's motion for a preliminary injunction, the trial court noted the following:

{¶ 72} "The court at this time will deny Cleveland's motion for injunctive relief pending trial. The parties' desires with regard to the scheduling of this case have been solicited on a regular basis. After the action was removed to and returned from federal court, Cleveland opted not to seek a prompt hearing on [a] preliminary injunction, but sought rather to engage in the extended discovery reflected in the voluminous materials relating to the summary judgment motions. Cleveland then waited to the final day of the dispositive motion period—almost one year after the action was filed and roughly three months prior to the scheduled June 20, 2005 trial date—to pursue its preliminary injunction request."

{¶ 73} At this point, we cannot render a judgment that could be carried into effect with respect to the performance of the drywall contract. Even if we concluded (which we expressly do not) that the trial court had erred in failing to enjoin the contract's performance, our opinion would be only advisory in nature. Consequently, we decline to address the assignment of error on its merits.

### Evidentiary Rulings

{¶ 74} In its third assignment of error, Cleveland argues that the trial court erred by ruling that it could not elicit testimony from Valley's subcontractors about events that had occurred after the city had awarded the contract to Valley. In support of its argument, Cleveland directs us to its examination of one of Valley's subcontractors, Marti Stouffer–Heis, owner of MS Construction Consultants.

{¶ 75} "Relevant evidence" is defined by Evid.R. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to

---

48. *Schuster v. Avon Lake,* 9th Dist. No. 03CA008271, 2003-Ohio-6587, at ¶ 3; *Pinkney v. Southwick Invs., L.L.C.,* 8th Dist. Nos. 85074 and 85075, 2005-Ohio-4167, 2005 WL 1926507; *Montgomery Cty. Bd. of Commrs. v. Saunders* (Nov. 2, 2001), 2nd Dist. No. 18592, 2001 WL 1346087; *Smola v. Legeza,* 11th Dist. No.2004–A–0038, 2005-Ohio-7059, 2005 WL 3610480; *Redmon v. City Council,* 10th Dist. No. 05AP–466, 2006-Ohio-2199, 2006 WL 1174506.

the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 402 provides that relevant evidence is admissible, subject to enumerated exceptions, and that evidence that is not relevant is not admissible. Although the terms of Evid.R. 402 are mandatory, a trial court is vested with broad discretion in determining whether evidence is relevant.[49] A reviewing court is therefore limited to a determination of whether the trial court abused its discretion in admitting or excluding the disputed evidence.[50]

{¶ 76} Cleveland's attorney attempted to elicit testimony from Stouffer–Heis about the city's postaward enforcement of its SBE program. Counsel asked whether Stouffer–Heis had been able to perform her described "[l]ogistics, project coordination" tasks at the construction site, and whether the city had performed any investigation upon submission of her request to be certified as an SBE supplier.

{¶ 77} The trial court indicated that it would allow testimony by a subcontractor with respect to the current status of the uncompleted project. And the court expressly permitted counsel to question Stouffer–Heis about whether she had been certified as an SBE supplier prior to the contract award. But the court instructed counsel to otherwise restrict his questioning to matters that had occurred prior to the contract award to Valley, because Cleveland's complaint had been predicated on the rejection of its bid.

{¶ 78} We find no abuse of discretion by the trial court in ruling that testimony related to postaward program enforcement was irrelevant and inadmissible. We overrule Cleveland's third assignment of error.

### Dismissal of City Employees

{¶ 79} In its fifth assignment of error, Cleveland argues that the trial court erred when it granted the individual defendants' motion to dismiss. The trial court dismissed Cleveland's claims against city employees Riordan, Franklin, Mullaney, Townsend, and Ranford in their "personal and individual capacities" on the basis of qualified immunity. Cleveland had also sued the employees in their "official capacities." Because the trial court did not explicitly dismiss the claims against the employees in their official capacities, we treat the official-capacity claims as claims against the city.[51]

---

**49.** See *Cincinnati v. Banks* (2001), 143 Ohio App.3d 272, 287, 757 N.E.2d 1205; *Siuda v. Howard,* 1st Dist. Nos. C–000656 and C–000687, 2002-Ohio-2292, 2002 WL 946188, ¶ 25.

**50.** See *Banks,* 143 Ohio App.3d 272, 757 N.E.2d 1205.

**51.** See *Asher Invests., Inc. v. Cincinnati* (1997), 122 Ohio App.3d 126, 137, 701 N.E.2d 400; *Norwell v. Cincinnati* (1999), 133 Ohio App.3d 790, 729 N.E.2d 1223.

{¶ 80} The doctrine of qualified immunity generally shields public officials performing discretionary functions from liability for civil damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[52]

{¶ 81} The doctrine recognizes the strong public interest in protecting public officials from the costs of defending against claims. A public official's entitlement to avoid the burdens of litigation "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."[53] To this end, a ruling on the issue of qualified immunity should be made as early as possible in the proceedings, before the commencement of discovery.[54] "[A] quick resolution of a qualified immunity claim is essential."[55]

{¶ 82} "Where a defendant official is entitled to qualified immunity, the plaintiff must plead facts which, if true, describe a violation of a clearly established statutory or constitutional right of which a reasonable public official, under an objective standard, would have known. The failure to so plead precludes a plaintiff from proceeding further, even from engaging in discovery, since the plaintiff has failed to allege acts that are outside the scope of the defendant's immunity."[56]

{¶ 83} In this case, Cleveland alleged that the city employees had violated its rights to due process and equal protection by failing to apply the cap in CMC 321-37 and by rejecting its bid as nonresponsive after applying provisions of a race-conscious program. These allegations were insufficient as a matter of law to describe a violation of a clearly established constitutional right. As demonstrated by the complex nature of the issues already discussed, the individual defendants could not have reasonably known that their actions were unconstitutional. Accordingly, we overrule Cleveland's fifth assignment of error.

### Conclusion

In conclusion, we reverse the trial court's entry of a directed verdict on Cleveland's claim for lost profits under Section 1983. We remand the cause for a

---

52. *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396.

53. *Mitchell v. Forsyth* (1985), 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411.

54. Id.

55. *Will v. Hallock* (2006), 546 U.S. 345, 126 S.Ct. 952, 960, 163 L.Ed.2d 836.

56. *Salt Lick Bancorp v. Fed. Deposit Ins. Corp.* (May 30, 2006), C.A.6 No. 05–5291, 187 Fed.Appx. 428, citing *Kennedy v. Cleveland* (C.A.6, 1986), 797 F.2d 297, 299.

new trial on the issues of liability and damages under Section 1983. In all other respects, the trial court's judgment is affirmed.

Judgment accordingly.

HILDEBRANDT, P.J., and PAINTER, J., concur.